# STATE v. GERALD P. CONNELLY AND BRYANT DUANE FLICK.

82 N. W. (2d) 489.

April 26, 1957—No. 36,968.

430

*Gordon C. Peterson,* for appellants.

*Miles Lord,* Attorney General, *John R. Murphy,* Assistant Attorney General, *George M. Scott,* County Attorney, and *Per M. Larson,* Assistant County Attorney, for respondent.

MATSON, JUSTICE.

Appeal from an order denying defendants' motion to vacate the verdict and grant a new trial.

Gerald P. Connelly, Bryant Duane Flick, Kenneth Lattin, and Edward Andrew Redden (the latter two appeared as witnesses for

the state) were indicted by the grand jury of Hennepin County for having committed the crime (see, M. S. A. 621.54[1]) of placing a noxious and inflammable substance against property. The indictment grew out of the dynamiting in the early morning hours of February 11, 1956, of an automobile owned by Antonio Felicetta, the secretary-treasurer of Local 707 of the Brewery, Liquor, Soft Drink, and Spring Water Drivers Union. The indictment charged each and all the defendants with having aided and abetted the others in the commission of the crime.

Defendants Connelly and Flick were tried together on the theory that they had aided and abetted the commission of the crime. The jury found these defendants guilty, and this appeal is from an order denying their motion for a vacation of the verdict and the granting of a new trial. In this opinion, except when specific reference is made by name, Connelly and Flick will be designated as the defendants and Redden and Lattin as the accomplices.

We have these issues: (1) Was it error, pursuant to § 8.01, for the attorney general's assistant to appear before the grand jury *upon the request of the county attorney but without a prior written request by the governor* for such appearance? (2) Was the testimony of the two accomplices sufficiently corroborated to sustain the conviction of the defendants? (3) Was it error to admit testimony of certain alleged unrelated and independent acts of the defendants? (4) Were defendants deprived of a fair trial by prejudicial remarks of the county attorney in addressing the jury?

█ Defendants contend that, pursuant to § 630.18(3),[2] the indict-

---

[1]"Every person who shall wilfully place or deposit or cause to be placed or deposited, or who aids or abets or who conspires to aid or abet in the placing or depositing in, upon, under, against, or near to any * * * car * * * any * * * injurious substance or compound, * * * with intent to wrongfully injure, molest, or coerce another, * * * shall be guilty of a gross misdemeanor; * * *."

[2]Section 630.18(3) provides:

"The indictment shall be set aside by the court in which the defendant is arraigned, upon his motion, in any of the following cases:

* * * * *

"(3) When a person shall have been permitted to be present at the ses-

ment should have been set aside on the ground that appearance of the attorney general's assistant before the grand jury was unauthorized in the absence of a prior written request from the governor. Whether his appearance was unauthorized depends upon the interpretation of § 8.01 which, insofar as here pertinent, reads:

"* * * Upon request of the county attorney he [the attorney general] shall appear in the district court in such criminal cases as he shall deem proper. Whenever the governor shall so request, in writing, he shall prosecute any person charged with an indictable offense; *and in all such cases he may attend upon the grand jury* and exercise the powers of a county attorney." (Italics supplied.)

In the instant case a request for assistance was made by the county attorney to the attorney general who directed one of his assistants to appear in his behalf as required by § 8.01, but the governor's written request for the attorney general's aid was not issued until after the appearance before the grand jury had been made.

In construing § 8.01 the specific question is whether the phrase *"and in all such cases he may attend upon the grand jury"* (italics supplied) applies only to requests made by the governor or applies also when the request comes from the county attorney. If the phrase applies also to requests made by the county attorney, then the governor's written request is not always an essential prerequisite to the attorney general's appearance before the grand jury. Since the language of § 8.01 is subject to an interpretation both ways, it becomes both necessary and proper to resort to a consideration of the legislative history of this section.[3]

Section 8.01 had its inception in L. 1858, c. 68, wherein the attorney general's authorized appearance was limited to cases in

sion of the grand jury while the charge embraced in the indictment was under consideration, except as provided by section 626.27." (Section 626.27 renumbered as § 628.63 provides that the grand jury may ask advice of the county attorney and that he may attend to frame indictments or examine witnesses.)

[3]See, Welscher v. Myhre, 231 Minn. 33, 42 N. W. (2d) 311; M. S. A. 645.16 (5, 7).

the supreme court, although when requested by the governor or the legislature he might appear for the state in any court or tribunal in which the state was a party or interested. By L. 1864, c. 65, his power was broadened so as to give him the right to appear in the district court in all criminal cases when requested to do so by the county attorney. Subsequently, by L. 1867, c. 94, § 1, the statute was amended so as to provide that:

"He [the attorney general] shall, upon the written request of the governor, prosecute any person charged with an indictable offence, and appear in the district court in all criminal cases, *when requested by the county attorney* of the county in which the same arise, whenever the public interest requires it, *and in such cases may attend upon and advise the grand jury,* in the same manner and for the same purpose as county attorneys are now authorized and required to do, \* \* \*." (Italics supplied.)

Pursuant to the 1867 amendment, the attorney general was clearly authorized to appear before the grand jury when requested to do so by the county attorney even though no written request had been made by the governor. In 1905 (L. 1905, c. 227, § 1) the statute was again changed and that change is now embodied in § 8.01. In determining if any change in meaning was effected by the 1905 amendment, we must keep in mind the general rule that in a revision a change in phraseology or punctuation is presumed to be intended to simplify the language of the prior act and not to change its meaning. Sexton v. Baehr, 212 Minn. 205, 207, 3 N. W. (2d) 1, 2. A comparison of the language of the 1905 amendment (as now embodied in § 8.01) with the wording of the 1867 act, reveals no clear legislative intent to change the law. In fact the only reasonable conclusion is to the contrary. The comparison of language reveals nothing more substantial than a change in phraseology and in the position of the statutory provisions. We can only conclude that § 8.01 is to be construed as expressing a legislative intent that the attorney general is authorized to appear before the grand jury when so requested by the county attorney even though no prior written request for his

appearance has been made by the governor. It follows that the appearance of the attorney general's assistant before the grand jury was both proper and lawful.

Since both Lattin and Redden were accomplices[4]—as admitted by the state—we come to the issue of whether their testimony was sufficiently corroborated to sustain the conviction of Connelly and Flick. The requirement of § 634.04[5] that the testimony of an accomplice must be corroborated in order to sustain a conviction is satisfied if the corroborative evidence tends in some substantial degree to affirm the truth of the testimony of the accomplice and to point to the guilt of the defendant. Corroborative evidence need not be sufficiently weighty that standing alone it would either make out a prima facie case or sustain a conviction, and it may be derived in a sufficient degree from the defendant's own testimony, or from circumstantial evidence which, in the light of the entire conduct of the defendant, clearly supports an inference of his connection with the crime.[6]

Where the crime for which the defendant is indicted and tried involves a conspiracy, the foregoing rule of corroboration is to be applied in conjunction with the following evidentiary rule:

"Everything said, written, or done by a conspirator in execution or furtherance of the common purpose to commit a crime is deemed to be the act of every party to the conspiracy, whether present or absent, and is admissible as evidence against each of them. The combination need not be established by direct proof. No formal agreement to commit the acts charged need be shown. The existence of the combination or conspiracy may be inferred from other facts

---

[4]The test to determine whether a witness is an accomplice is whether he himself could have been indicted for the offense as a principal or accessory. State v. Sweeney, 180 Minn. 450, 231 N. W. 225, 73 A. L. R. 380.

[5]"A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

[6]State v. Rasmussen, 241 Minn. 310, 313, 63 N. W. (2d) 1, 3, and cases therein cited; see, 5 Dunnell, Dig. (3 ed.) § 2457.

proved. If the other facts proved show that the defendants, by their acts, pursued the same object, often by the same means, one performing one part and another another part of the same so as to accomplish a common purpose, the existence of the conspiracy is one of fact. * * * As said in Kelley v. People, 55 N. Y. 565, 576, 14 Am. R. 342, 350: 'One party may allure the victim into the den, leaving it to others to effect the robbery, and all will be held equally guilty as confederates.' "[7]

In applying the above rule it is immaterial whether conspirator is a defendant or an accomplice.

■ In sifting the evidence to determine if it sustains a conviction, the testimony of the accomplices becomes of evidentiary weight on two different grounds; first, on the ground of corroboration, if sufficient corroboration exists, and second, where a conspiracy exists, on the ground that the acts and declarations of one conspirator in furtherance of the common conspiracy are deemed to be the act of each party to the conspiracy and are admissible against each of them. Aside from the second ground that a conspiracy, of which the alleged crime is an integral part, makes the acts, declarations, and admissions of one conspirator—whether he be an accomplice or a defendant—admissible against each of his coconspirators, the conspiracy itself is an evidentiary manifestation of defendant's conduct and as such may be considered as tending to corroborate the testimony of an accomplice.

In the light of these evidentiary rules we turn first to the testimony of Lattin, one of the accomplices. He testified that about January 20, 1956, he was asked by defendant Flick to take part in giving a former union official, Art Morgan, a physical beating. About a week later he met Connelly for the first time when he, Flick, and one Heid accompanied Connelly to the Teamsters Building in St. Paul

[7]State v. Kahner, 217 Minn. 574, 581, 15 N. W. (2d) 105, 109, certiorari denied, 323 U. S. 768, 65 S. Ct. 121, 89 L. ed. 614; see, State v. Tennyson, 212 Minn. 158, 2 N. W. (2d) 833, 139 A. L. R. 987; State v. Dunn, 140 Minn. 308, 168 N. W. 2; 5 Dunnell, Dig. (3 ed.) § 2460; 11 Am. Jur., Conspiracy, §§ 40 to 42.

where they called on Joseph Wagner, the secretary-treasurer for the Brewery and Beverage Drivers of Local 993, to secure permission to organize the St. Paul liquor stores. During the visit threatening gestures were made in front of Wagner by Heid who repeatedly pounded his right fist into the palm of his left hand. Wagner told Connelly that permission to organize the St. Paul liquor stores could be obtained only by appearing before the Teamsters Joint Council. After leaving Wagner's office, Connelly told his associates that if Wagner didn't go along he would split his head clear down to his crotch. Shortly thereafter Connelly left for Florida. On February 7 Flick talked to Connelly by long-distance telephone and told him the picket lines were being violated. After completing the telephone call, Flick turned to Lattin and said that, if the crossing of the picket lines continued, they would have to get some dynamite. On February 8 Flick and Lattin drove to Osseo where Lattin purchased six sticks of dynamite. During the drive to Osseo Flick remarked that they would put the dynamite on the back end of Felicetta's and Wagner's cars and that, if that didn't do the trick, they would put it down by the clutch pedals.

On the way back to Minneapolis Lattin and Flick collected dues at a number of liquor stores. At one of these stores, Flick remarked that he had to go back to the union hall because he was expecting a phone call. On the way to the union office Flick said they thought the telephone was tapped and that, therefore, in telephoning they couldn't use the word "bomb" or "dynamite" but would use the word "conversation" instead. After Flick completed the telephone call he said that he had gotten the word to go ahead. Having brought the dynamite up to the union office, Flick then demonstrated to Lattin how to attach the detonator and the fuse. Flick then remarked that they would have to get the job done before Connelly returned from Miami so he wouldn't be here when it happened.

On February 10, Flick asked Lattin to persuade Chuck Bellecourt to help with the bombing but the latter refused. One Robert Kruse was next approached but he also declined to participate. The unsuccessful approaches to Bellecourt and Kruse were made right in

Connelly's union office. On this same day (the day of the dynamiting), Lattin heard Flick say in the course of a long distance telephone call to Florida that "the party is all arranged and the invitations were sent out."

On the evening of February 10, after some of the dynamite had been transferred to Lattin's car, Flick, Redden, and Lattin went to the Venice Cafe. After spending some time there visiting friends, Lattin and Redden proceeded to St. Paul where they dynamited the back porch of Joe Wagner's home. Lattin stopped at a cafe and reported the dynamiting to Flick by telephone. They then returned to Minneapolis where they stopped at the Stone Hotel and went up to a room occupied by Flick. While there, Flick said they should dynamite Tony Felicetta's car next. About 1:30 or 2 a. m. Lattin and Redden proceeded to Felicetta's house where the latter's car was dynamited. Lattin recalls that he saw a man come out of a house across the street from Felicetta's and get into a car and drive away while they were placing the dynamite. After setting off the explosive, they went to the Nicollet Hotel and subsequently returned to the Stone Hotel where Lattin spent the night in the room occupied by Flick.

On February 12 Lattin saw Connelly in Jack's Cafe at about 1 p. m. Connelly then told him that they had done a good job. The next day, Lattin, acting on orders from Flick, turned the unused dynamite over to Howard B. McGonagle, the caretaker of a roominghouse where he and Flick had previously stayed.

The other accomplice, Redden, substantiated and supplemented Lattin's testimony. Redden said that on February 6 he unsuccessfully sought work from Flick. At that time Flick said that he was Connelly's right-hand man. Redden next saw Flick on February 8 or 9 when he was hired to picket in St. Paul. On February 10 he was asked by Flick if he would go along on the bombing job. Redden related how he had accompanied Lattin when Joseph Wagner's St. Paul home was dynamited. He said that when they returned to Minneapolis they spent several hours in Flick's room at the Stone Hotel. He also verified how early in the morning they dynamited

Felicetta's car. Redden, as he ran after lighting the fuse on the Felicetta car, saw the man coming out of the house across the street.

We next turn to evidence which directly or by inference tends to corroborate the testimony of the accomplices. Donna Redden, wife of one of the accomplices, testified that Flick in her presence said he was working for Connelly and that any orders he gave came directly from Connelly. Duane Erickson, the man who in the early morning hours came out from the house across the street when Felicetta's car was about to be dynamited, testified he then saw Redden's 1950 Oldsmobile parked in front of the Felicetta home. Erickson also identified Redden by describing the gray-and-red-trimmed jacket which the latter admittedly wore at the time. Joseph Wagner described Connelly's visit to his office when the latter was accompanied by former boxers, one of whom made threatening gestures. Telephone company records of long-distance calls to Connelly in Florida from his Minneapolis office established the accuracy of Lattin's testimony as to when the calls were made. In fact, defendant Flick admitted he had talked by phone almost every day with Connelly while the latter was in Florida. Marvin Sternberg, a liquor-store owner, said that on February 8, Flick, while in his store, made a phone call and right afterwards told Lattin they had to get back to the office because something important had come up as a result of a telephone call from Jerry (Connelly was usually referred to as Jerry by his associates). The Osseo hardware dealer verified the sale of the dynamite to Lattin. Frederick A. Laughnan said defendant Flick and George Heid had asked him if he wanted to make a little money on the side by helping to "rough up" and "bust a few fingers" of a fellow who had crossed the picket line. Charles Belle-court related that on the morning of February 9 he saw dynamite in Lattin's car and that the latter had several times asked him to go along on the job. Robert Kruse told that, upon Lattin's request, he had transferred the dynamite from under the front seat of the Lattin car to the glove compartment. Then we have also the significant fact that the dynamite was stored for a time in Connelly's union office. The presence of Flick, Lattin, and another man (otherwise identified

as Redden) in the Venice Cafe early in the evening of February 10 was testified to by Michael Boosalis. Boosalis also saw, Lattin and Connelly on the 12th when Lattin said Connelly had told him that they had done a good job. The presence of Lattin in the Stone Hotel was verified by the room clerk as well as by his registration for the room which was also occupied by Flick. Finally, we have the testimony of Howard McGonagle that Flick asked him if he would store some dynamite for him and that Lattin brought the dynamite to him.

Additional corroboration is found in the fact that a conspiracy obviously existed to compel liquor dealers to recognize and contract with Connelly's union and to force rival labor leaders to recognize Connelly's dominance. Several liquor dealers testified that defendant Flick, accompanied by either Lattin or George Heid, had called on them and that, when they were reluctant to accede to Flick's demands, they were told it would be a shame to have the nice glass on their premises broken; that it wouldn't be nice to see their cars turned over in the street; that they would be organized even if it were necessary to use baseball bats; and that the only protection to be given by Connelly's union would be to insure that their windows would stay in one piece. The only reasonable inference to be drawn from defendant Flick's activities is that he was carrying out Connelly's orders in furtherance of a studied campaign of threats and violence. All activities were directed to a common objective of intimidating dealers and others to pay tribute to Connelly's organization. The crime of dynamiting Felicetta's car was an integral part of this organized conspiracy. Clearly, the testimony of the accomplices is overwhelmingly sustained as to defendant Flick. It is also sufficiently corroborated as to defendant Connelly. Aside from the theory of corroboration, defendant Connelly's guilt is further sustained by admissible evidence since he was a part of a common conspiracy to commit a crime and everything said, written, or done by any of his conspirators, inclusive of Flick and the two accomplices, must be deemed to be Connelly's act and admissible as evidence against him. Since he directed and guided his coconspirators, it is immaterial that he was absent in Florida when the actual crime was committed.

■ Defendants assert that admission of testimony concerning threats made to liquor-store dealers and to Joseph Wagner, and likewise as to the dynamiting of the latter's residence, was evidence of other independent and distinct crimes and as such was prejudicial to the defendants and deprived them of a fair trial. It is the general rule that evidence of other separate and independent crimes is inadmissible in the trial of a defendant charged with a criminal offense.[8] The obvious reason for this general rule is that such other and independent offenses are not legally relevant and should not be permitted to prejudice the defendant or to create the probability of guilt. The general rule is, however, subject to certain exceptions. One of the well-established exceptions to the general rule permits the introduction of proof of other separate and distinct crimes of a similar nature where they show a general scheme or plan to commit acts similar to the one with which the defendant is charged, and such evidence is admitted not for the specific purpose of showing that the defendant committed the crime charged but to permit the factfinder to draw an inference from such general scheme or plan that the defendant did commit the crime for which he is being tried. Evidence of commission of other similar and independent crimes which show a common scheme or plan to be admissible must, of course, appear to be so related that proof of them reasonably tends to establish defendant's guilt of the crime for which he is being tried.[9] The foregoing exception to the general rule is applicable to this case and no error occurred. The evidence clearly establishes that the threats and dynamiting had just one purpose to serve, namely, an object lesson to those who chose to oppose the plan to organize the liquor stores in St. Paul and Minneapolis. Proof of the separate and independent offenses related to acts which were similar to each other, and to the crime for which the defendants

---

[8] State v. Fitchette, 88 Minn. 145, 92 N. W. 527; 5 Dunnell, Dig. (3 ed.) § 2459.

[9] State v. DePauw, 246 Minn. 91, 74 N. W. (2d) 297; State v. Monroe, 142 Minn. 394, 172 N. W. 313; State v. Bock, 229 Minn. 449, 39 N. W. (2d) 887; City of St. Paul v. Greene, 238 Minn. 202, 56 N. W. (2d) 423, 40 A. L. R. (2d) 812; 5 Dunnell, Dig. (3 ed.) § 2459.

were being tried, and were clearly part of a general scheme, conspiracy, or plan.

Finally, we have the contention that defendants were deprived of a fair trial by prejudicial remarks of the county attorney in addressing the jury. In his address to the jury the prosecutor said:

"I might just say that I don't know what a jury in the State of Florida where the defendant Connelly used to organize what they would do and I don't know what a jury in Detroit, Michigan, where Mr. Connelly used to organize would do and I don't know what a jury or the people of Kansas City where Mr. Connelly now operates out of would do, but I wonder if the jury in Hennepin County, Minnesota, is going to give a license for open season on Tony Felicetta and Joe Wagner and others."

Objection is made to the above remarks with respect to the reference to defendant Connelly's out-of-state organizational activities. Defendants assert that the prosecuting attorney's statement charged Connelly with being guilty of acts in other places, of which there was no evidence, and that his statement conveyed the impression that Connelly was "a bad man" and that, therefore, society should get rid of him. Although it was unwise for the prosecutor to make the statement, we cannot say that it was prejudicial, in the light of the argument as a whole and the evidence adduced. In the course of the trial there was testimony that Connelly, himself, made reference to how he organized in Detroit and Florida and that he had stated that he was acting under a trusteeship from a Kansas City labor official. In view of the evidence, the plain import of the prosecutor's statement was that he did not know what the jurors in these three areas would do if faced with the instant case. The language, therefore, does not reveal an attempt to suggest that Connelly performed similar unlawful acts elsewhere or that he was generally a bad man. The most that can be said for the aforesaid statement, which was singled out of the argument as a whole, is that it is in the nature of an over-oratorical method of asking the jury to bring in a verdict of guilty. No prejudicial error occurred.

442

Since the verdict of guilt is sustained as to both defendants, and since no prejudicial errors occurred, the order of the trial court is affirmed.

Affirmed.