STATE EX REL. VIRGIL M. OGG v. RALPH H. TAHASH.

140 N. W. (2d) 692.

February 11, 1966—No. 39,743.

*Johnson, Schmidt & Thompson,* for appellant.

*Robert W. Mattson,* Attorney General, *Gerard W. Snell,* Solicitor Gen-

eral, and *Linus J. Hammond,* Assistant Attorney General, for respondent, warden of State Prison.

THOMAS GALLAGHER, JUSTICE.

Appeal from an order of the District Court of Washington County which denied the petition of Virgil M. Ogg for a writ of habeas corpus. On September 18, 1962, Ogg, hereinafter referred to as defendant, was convicted of the crime of burglary in the third degree by a jury in the District Court of Kandiyohi County. The burglary took place at the Legion Club in the village of New London in the early morning of July 12, 1962, and was discovered when the club opened about 8 a. m. the same day. Therein certain coin-metered machines had been broken open and coins marked with a red pencil, and a cigar box containing coins and coin wrappers had been taken.

On September 1, 1964, the present proceedings for a writ of habeas corpus were commenced in the District Court of Washington County. Defendant claimed that he was unlawfully detained for the following reasons: (1) That he had been arrested and confined without reasonable cause for his arrest and that his automobile had been illegally searched and evidence therein illegally seized and used at his trial; (2) that his purported confession had been illegally obtained and used by the state as part of its case against him; (3) that he had been convicted and sentenced on the uncorroborated testimony of an accomplice; and (4) that he had been denied his constitutional right to have counsel within reasonable time after his arrest and that he was inadequately represented by counsel at his trial.

The petition for habeas corpus was heard in the District Court of Washington County on October 8, 1964. At that time, the court examined transcripts of testimony submitted at the trial, including that of police officers who had taken defendant into custody and who had searched his car and later had obtained the confession; and that of David Johnson which is hereafter outlined. The court made reference to an unverified document submitted by defendant entitled "Facts and Law," in which statements of defendant regarding his arrest and trial were set forth. These statements have no support in the record or in the tran-

scripts of testimony submitted at the trial, and are in conflict with much of this testimony. Based upon the evidence described, the court found that defendant's allegations were sham and false and denied his petition for the writ of habeas corpus.

The facts of defendant's arrest and detention, and his conviction of the New London burglary, may be summarized as follows: Elvin Magnuson, deputy sheriff of Kandiyohi County, testified that on July 12, 1962, at about 2 a. m., while patrolling the streets of the village of Kandiyohi accompanied by Police Officer Leon Wiese he had observed an automobile come out of an alley from the rear of the *Red and White Store* and stop on the street; that he had then left his police car to identify the occupants of this automobile and had then observed that defendant and another person, later identified as David Johnson, were in it; that at his request defendant had then exhibited his driver's license, and the passenger, David Johnson, had exhibited a birth certificate; that he then had written down the names of defendant and Johnson and also the make, year, and license number of the automobile — a 1953 green Buick with license number 6D-2107; that defendant had then stated that he was searching for a gasoline station; and that he (the witness) had then permitted them to proceed, although he had observed that the car had about a quarter of a tank of gasoline.

Clayton Edwards, a police officer of the Litchfield Police Department, testified that at about 2:35 a. m. July 12, 1962, he was alerted by the police dispatcher that there had been a burglary in nearby Willmar and that if he observed a 1953 green Buick, license number 6D-2107, which had been seen earlier in Kandiyohi, he should stop and check it (the car description and license number had been called to Willmar by Deputy Sheriff Magnuson after he had learned of the Willmar burglary); that at about 2:45 a. m. he had observed a car which fit the description given approaching Litchfield from the direction of Willmar; that he and Officer Herman Klitzke followed this car into Litchfield where it turned off the highway, circled back to a cafe and filling station, and stopped; that its two occupants then left it to go into the cafe; that in the meantime he had received a call that the occupants of the car should be arrested on suspicion of having committed the Willmar burglary; that he and Officer

Klitzke then entered the restaurant and placed defendant and Johnson under arrest, advising them that it was for a burglary in Kandiyohi County, of which they both denied any knowledge; that after they had been arrested he obtained the car keys and discovered a ballpeen hammer, two screwdrivers, a jack handle, a glove, and many coins, mostly nickels, dimes, and quarters in the car; that none of these items had been touched or removed and that the car was locked and left where it had been parked; that at about 3:30 a. m. Police Officer Nick Curtis of the Willmar Police Department and Deputy Sheriff Magnuson arrived at Litchfield, and that he then delivered the car keys to Curtis who made another inspection of the car.

Officer Curtis testified that in addition to the coins and coin wrappers described he had discovered a cigar box filled with loose coins and wrappers in the car; that he then drove it to the Litchfield jail where defendant and Johnson were placed in custody; that later he drove defendant and his car to the county jail at Willmar; and that the car was again inspected at Willmar and the articles previously observed were identified, listed, and left in the office of the chief of police at Willmar.

Sanford Larson, an officer of the Willmar Police Department, testified that when the car with defendant and Johnson was brought to the Willmar station Police Chief Lyle Goeddertz of the Willmar Police Department asked defendant for permission to check out the car and that he, Larson, then proceeded to examine its contents; that he wrote down a list of the articles above described; and that all of the articles were left in the office of Chief Goeddertz.

Chief Goeddertz testified that he first saw defendant about 5 or 6 a. m. in the morning of July 12, 1962, when he had a short conversation with him regarding the Willmar burglary while still unaware of the burglary in New London; that about 1:15 p. m. after he had been apprised of the New London burglary, he again talked to defendant and obtained a written confession from him with respect to the New London burglary. This written confession was not offered in evidence but Chief Goeddertz testified:

"* * * Mr. Ogg gave a statement at that time, and in his statement he gave his name and various other facts, his age and his birth date, and

so on, and he also in this statement stated that he had entered the New London Legion Club, that Dave Johnson had, if I recall the exact words — I think Dave Johnson had gone in first through a window and that he had gone in behind Dave Johnson into the Legion Club at New London.

\* \* \* \* \*

"\* \* \* I think that he stated that he broke open a machine there, if I recall. I don't have the statement with me, but what he said is in the statement."

When he was asked whether any promises or inducements were made to defendant at that time, he testified that none had been made; that he did not believe that he had ever told defendant that by confessing to the New London burglary he would be charged only with that offense, but that he did recall that he told defendant the day following the confession that defendant would probably be charged with only the New London offense.

Following defendant's arrest, the record indicates the following:

On July 12, 1962, a complaint charging defendant with burglary in Willmar was issued and on that date he was brought before a magistrate where he waived preliminary examination and was bound over to district court for trial. It does not appear that he was then represented by counsel. On September 7, 1962, a complaint charging him with the New London burglary was issued and he was again brought before a magistrate and again waived preliminary examination and again was bound over for trial.

On September 10, 1962, he appeared for arraignment in the District Court of Kandiyohi County, at which time the court appointed counsel to represent him. An information charging him with burglary in the third degree for the New London offense which had been filed was read to him and his attorney entered a plea of "not guilty" on his behalf. He was also arraigned for the Willmar burglary and his attorney, on his behalf, entered a plea of "not guilty." Subsequently, the Willmar charge was dismissed and he was tried only for the New London burglary.

At his trial he was represented by court-appointed counsel, and the evidence above outlined, including the articles taken from his car, was received. In addition David Johnson testified that he was the son of

defendant; that he had been with defendant on July 12, 1962, when they had driven from St. Cloud to New London in defendant's 1953 Buick and had arrived shortly after midnight; that they had gone directly to the Legion Club where they both climbed through a small basement window; that after they had entered they had broken into two coin-metered machines and the cash register and taken all the coins in them; that they had used a tire iron to break into the machines; that they had removed a cigar box in which they had placed a number of coins; that this was the same cigar box which was later taken from defendant's car; that they had left the building through its rear entrance and had then driven to Willmar and from Willmar to Kandiyohi where they were stopped and questioned by police officers; and that thereafter they had proceeded to Litchfield where they were apprehended.

Based upon the evidence described, the jury returned a verdict of "guilty" against defendant.

On September 18, 1962, after defendant's conviction for the New London burglary, he pleaded guilty to an information charging him with seven prior felonies. Thereafter he was sentenced to State Prison at Stillwater for 20 years. No appeal was taken from the judgment of conviction or the sentence.

■ We find no violation of defendant's constitutional rights in his apprehension in the early morning of July 12, 1962, nor in the search of his automobile and the seizure of incriminating evidence which occurred shortly thereafter. His car had been observed about an hour before under suspicious circumstances in an alley at Kandiyohi where he was first questioned by police officers. Shortly after this questioning the details of the Willmar burglary had been broadcast on the Willmar police radio and the same officers who had questioned defendant in Kandiyohi recalled his suspicious actions there and called in a full description of the car and its occupants to the Willmar police. With this information in mind and with directions to apprehend the occupants of defendant's car, the Litchfield police officers arrested defendant and his son after his car had been stopped in Litchfield. There is nothing to indicate that the search of his car which followed was without his consent. Certainly this procedure was justified by the suspicious circumstances under which he

had been observed and apprehended. In this age when many crimes are possible with the aid of automobiles, their presence near the scenes of crimes under suspicious circumstances, however slight, should impose upon police the duty to stop and question their occupants, to inspect or search them, and to remove incriminating evidence found therein. See, State v. Olson, 271 Minn. 50, 135 N. W. (2d) 181; State ex rel. Branchaud v. Hedman, 269 Minn. 375, 130 N. W. (2d) 628; State v. Harris, 265 Minn. 260, 121 N. W. (2d) 327; United States v. Ventresca, 380 U. S. 102, 85 S. Ct. 741, 13 L. ed. (2d) 684. To hold otherwise would make a farce of the police protection to which all citizens are entitled.

■ With respect to defendant's oral and written confessions obtained July 12, 1962, it is clear that neither was the result of coercion, or of any promises then made to him. Rather they came during ordinary police investigative processes which must always follow an arrest, and questioning must take place to ascertain whether there are reasonable grounds for holding the person arrested, or whether he should be released. Any confession or incriminating statements resulting from this procedure should not be held invalid merely because the person arrested was not first advised as to his right to counsel or to remain silent.

Thus in United States v. Cone (2 Cir.) 354 F. (2d) 119, in which Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. ed. (2d) 977, is distinguished, the court stated (354 F. [2d] 123):

"It is * * * urged that Escobedo v. State of Illinois, 378 U. S. 478, 84 S. Ct. 1758 (1964), now requires the federal courts to extend the Sixth Amendment right to the assistance of counsel to the questioning of any suspect when he is arrested and that the suspect must then be advised of his right to silence and to counsel before being questioned. We do not agree and we find nothing in Escobedo which supports such a rule or which requires its extension to defendants who are questioned immediately upon their arrest. Text, context and history of the Sixth Amendment lead to the conclusion that the framers were addressing themselves to judicial proceedings, where a person is obliged to defend himself in a process fraught with the technicalities and procedural niceties of the criminal law. This protection has been extended to preliminary hearings before a magistrate, also part of the criminal prosecution.

"Of course, the lack of counsel and the failure to advise an accused that he has the right to counsel before speaking have been considered in many cases decided prior to Escobedo to be relevant factors in determining the voluntariness of statements made by an accused prior to his arraignment. But in these cases, there were factors not present here, such as questioning for many hours, often with an ignorant or physically weakened suspect; incommunicado detention; lack of sleep and food; threats of violence and sometimes actual violence; and so forth. * * * we would be misreading Escobedo if we extended it to embrace every inculpatory statement, made prior to arraignment and without full warning, by any person whom the police suspected of crime. Wherever the bar created by the Escobedo decision may ultimately be held to fall, it does not come so early in the process of police investigation as the interrogation here.

"* * * We find nothing in the language * * * of the Federal Constitution * * * which requires that every person suspected of crime be advised of his rights to silence and to counsel, failing which *any* statement thereafter made is inadmissible."

See, also, United States v. Robinson (2 Cir.) 354 F. (2d) 109.

On this issue it may be said that there is nothing to support the unverified accusations of defendant made some 2 years after his confession that it had been made after continuous questioning for many hours and after he had been struck by police officers. The uncontroverted testimony of police officers submitted at the trial was to the contrary and we do not feel that a writ should issue on unverified statements of a defendant, made years after his trial, which are in direct conflict with undisputed testimony received therein.

■ Defendant further contends that his conviction was invalid because it was based upon the testimony of his accomplice, Johnson. Minn. St. 634.04 provides:

"A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

We have held that these statutory requirements are satisfied if the corroborative testimony referred to tends in some substantial degree to affirm the truth of the testimony of the accomplice and points to the guilt of the defendant. State v. Connelly, 249 Minn. 429, 82 N. W. (2d) 489; State v. Soltau, 212 Minn. 20, 2 N. W. (2d) 155; State v. Guy, 259 Minn. 67, 105 N. W. (2d) 892; State v. McLaughlin, 250 Minn. 309, 84 N. W. (2d) 664. The statute does not make the testimony of an accomplice incompetent and even an accomplice who has plead guilty is not disqualified from testifying against other defendants. State v. Armstrong, 257 Minn. 295, 101 N. W. (2d) 398. Here there was substantial corroborative evidence to support the testimony of the accomplice in linking defendant to the crime. This would include the marked coins and the cigar box taken in the burglary and obtained from defendant's car a short time thereafter; the burglary tools removed from his car; and the statements made by defendant to the police officers after his arrest. Obviously, such evidence was more than adequate to corroborate the testimony of the accomplice and to sustain the jury's finding with respect to defendant's guilt.

■ It is true that after the police investigation and after defendant had been formally charged and bound over to the district court it was some time before counsel was appointed to defend him. While we do not condone this policy, it is obvious from the record that no prejudice resulted to defendant from this procedure. He had previously made incriminating statements during normal police investigative processes and his subsequent detention would not invalidate them. At no time did he request counsel or ask for a continuance after his counsel was appointed. There is no showing as to additional evidence which could have been procured had his trial been delayed. It is his claim that his counsel did not adequately represent him because no motion was made to suppress illegally obtained evidence, or to suppress the incriminating statements referred to; or for dismissal because of improper arraignment. These claims are best answered by pointing out that none of the motions described should have been granted had they been made at the trial.

It follows that defendant's detention without counsel and his representation by court-appointed counsel which appears to have been ade-

quate would not now justify a determination that his conviction was invalid or that a new trial should be granted. State v. Demry, 260 Minn. 173, 109 N. W. (2d) 587; State ex rel. Adams v. Rigg, 252 Minn. 283, 89 N. W. (2d) 898.

Affirmed.