## STATE v. ROBERT EARL MADSON.

142 N. W. (2d) 724.

May 13, 1966—No. 39,778.

*John D. Holden,* for appellant.

*Robert W. Mattson,* Attorney General, and *Carl E. Erickson,* County Attorney, for respondent.

FRANK T. GALLAGHER, C.

Appeal from a judgment of conviction for burglary.

Defendant was arrested on the night of March 6, 1964. On March 9, 1964, a complaint was filed and a warrant issued. Upon his appearance in the municipal court, a preliminary hearing was demanded by defendant. The hearing was held on April 6, at which time defendant, represented by counsel, was bound over to the district court. About a week later an information was filed charging him with burglary contrary to Minn. St. 609.58, subd. 2(1)(a). On April 22 he pleaded not guilty to the crime charged in the information. He was tried before a jury which returned a verdict of guilty, and he was sentenced to a maximum term of imprisonment of 10 years.

On March 6, 1964, at about 11:40 p. m., a captain of the Brainerd Police Force received a telephone report of activities around a Brainerd

"Super Market" food store. Two squad cars were immediately dispatched to the store. The sheriff's office and the highway patrol were also notified. The squad cars arrived within two or three minutes and, shortly thereafter, two men ran from the building. One man leaped through a small window in the rear; the other came through a hole in the front window which had just been smashed from the inside by a sledgehammer. Both of these men were pursued, but both escaped.

The sheriff and two deputies arrived within minutes thereafter, as did other Brainerd police officers and the owner of the store. The officers and the owner investigated the store and found the sledgehammer (actually found on the driveway in front of the broken window), an axe, a wrecking bar, a flashlight, and a large screwdriver. These tools were found on the first floor or ground level.

In the course of this investigation, the sheriff and one of his deputies went into the basement of the store and found defendant lying on the floor. He was searched, taken upstairs and out of the store through the broken window, placed in a squad car, and taken to the police station. Before leaving the store, the officers found a screwdriver by a small window on the first floor. At the station a small screwdriver was taken from defendant's person. After defendant's arrival at the police station, it was discovered that he was wearing two sets of clothing. A pair of gloves had been found in a pocket.

The store investigation also disclosed dents in, and paint chipped from, the store safe. Merchandise was scattered around near the safe. There were two sacks on the checkout counter, one containing cigarettes and the other containing money in change. The door at the rear of the building was damaged—locks had been ripped off. These conditions had not existed when the owner closed the store earlier that evening; nor had the owner ever authorized defendant's entrance or presence in the store.

At the time of trial, defendant was 26 years of age. He had 4 prior convictions: 1954—incorrigibility; 1956—petty larceny; 1956—criminal negligence; 1960—grand larceny. He was a painter, living in Minneapolis and receiving unemployment compensation immediately prior to March 6, 1964. Defendant testified that earlier in the day, on March 6, he met two men in a bar in Minneapolis and they consented to take

him on a ride with them. They procured a "fifth" of whisky and drove to Brainerd, then to Detroit Lakes, and then back to Brainerd. Defendant said that he was told by the two men that they were looking for a "buddy." On the way back to Brainerd from Detroit Lakes, defendant said that he fell asleep about 30 miles from Brainerd. Later he was shaken awake and told to follow the men. He said that he thought their "buddy" had been found, so he followed the men and then found himself in the store; that he tried to leave but found the door locked and, upon trying another door, he fell down the basement stairway. He claimed that he had not been told of any plan to burglarize the store and that he had two sets of clothes on because he had been cold while riding in the car.

At the trial, defendant's counsel objected to certain admissions made by defendant. He moved the court that all testimony as to conversations with the defendant be stricken and that the jury be instructed to disregard the conversations, as a violation of the accused's constitutional rights against self-incrimination. The motion was denied. These admissions included matters related by witnesses for the prosecution in response to questions by the prosecuting attorney. On appeal defendant seeks a decision finding him not guilty or granting him a new trial. The pertinent issue for determination here is whether statements made by the defendant to officers prior to the appointment of his counsel and his preliminary hearing were erroneously and prejudicially admitted into evidence by the trial court.

In connection with the objected-to statements and conversations, Captain James McComas, who was present in the police station immediately after defendant's arrest, testified that the accused did not give his name and refused to give any information but said he was trying to gain time for his buddies. The sheriff of Crow Wing County testified that at the time of his arrest and later that evening in the city hall defendant said his name was Earl Flynn. When told by that officer that sooner or later they would find out who he was, defendant replied that he was buying time for his buddies, and if the officers knew who he was, they would probably know who his buddies were. According to the sheriff, defendant also said that he had a bad leg, otherwise he would also have gotten

away; that defendant did not ask for counsel nor did the sheriff recall if defendant was advised of his rights.

John Mast, an investigating officer called by the prosecution, testified that he talked with defendant in the city jail about March 9, 1964. He said that he asked defendant where all the tools from the burglary came from and was told that they were in the car, but did not say what car. He talked with defendant at the jail on other occasions, including March 11 when he mentioned to defendant that on March 6 he had noticed a car like the burglars' car west of the city near the overpass and that he took the license number. When the defendant asked why he took the license number, the officer answered that he recognized it as being a Duluth license. It was making a slow turn opposite Harold's Liquor Store and he "noticed these three dark fellows there and it appeared they might be looking over the place." When he mentioned to defendant that it looked like they were casing the liquor store, the officer said that defendant laughed and said "a smart man."

Another investigating officer, Robert Fitzsimmons, testified that he talked with defendant in the jail a few days after March 7. Defendant told him he was the lookout man; that they needed help inside and he went in to help them; that the police came then, and when he tried to get out the same door, it had locked itself; that he would have run too if it hadn't been for that.

It is our opinion that the present case is controlled by State ex rel. Ogg v. Tahash, 273 Minn. 187, 140 N. W. (2d) 692. We shall not attempt to compare in detail the facts in that case and the one before us. The defendant there had been observed driving his automobile through an alley in a small village in Minnesota at about 2 o'clock in the morning. Stopped and questioned by the police as to his reasons for being there, defendant gave answers which cast doubt upon his purposes. After being advised that a burglary had been committed not too far from the place where defendant had been observed, the police called in a description of the suspect and his car to police headquarters. We held there that subsequent apprehension of the defendant and seizure of incriminating evidence in his car did not constitute a violation of his constitutional rights against unlawful search and seizure. We also held with re-

spect to defendant's oral and written confessions obtained that day that it was clear that they were not the result of coercion or any promises made to him, but, instead, that they came during ordinary police investigative processes which must always follow an arrest. We said that questioning must take place to ascertain whether there are reasonable grounds for holding the person arrested or whether he should be released; that any confession or incriminating statements resulting from this procedure should not be held invalid merely because the person arrested was not first advised as to his right to counsel or to remain silent.

We find nothing in the record here to indicate that the defendant's conversations or statements were the results of coercions, threats, or promises on the part of the investigating officers. Rather it would appear that they came about during the ordinary investigative process conducted by the officers.

We do not consider the cases cited by defendant as controlling under the facts and circumstances here. In State v. Garden, 267 Minn. 97, 125 N. W. (2d) 591, defendant had been incarcerated for 17 days before making damaging admissions. Furthermore, there was some indication that the interrogations were intensive. In the present case defendant was incarcerated for only 3 days before he was presented in municipal court, and he made no admissions after the fifth day of incarceration.

We also consider the United States Supreme Court cases[1] cited by defendant as distinguishable from the case before us. In each of those cases it appears that there were elements of psychological and physical coercion resulting in involuntary confessions which were clearly beyond mere detention and investigation.

It is our opinion that there was no reversible error on the part of the trial court in failing to exclude the conversations and admissions of the defendant.

Affirmed.

---

[1] Culombe v. Connecticut, 367 U. S. 568, 81 S. Ct. 1860, 6 L. ed. (2d) 1037; Haynes v. Washington, 373 U. S. 503, 83 S. Ct. 1336, 10 L. ed. (2d) 513; Watts v. Indiana, 338 U. S. 49, 69 S. Ct. 1347, 93 L. ed. 1801.