**STATE of Minnesota, Respondent,**

v.

**James Willis BLACK, Appellant.**

**No. 49314.**

Supreme Court of Minnesota.

March 14, 1980.

C. Paul Jones, Public Defender, and Robert D. Goodell, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Div., David W. Larson and Toni Beitz, Asst. County Attys., Minneapolis, for respondent.

Heard before OTIS, KELLY, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal from a conviction of three counts of first degree murder by a jury in the Hennepin County District Court. In separate trials, defendant's two accomplices, Jean Link[1] and Dale Olson, were also convicted on three counts each of first degree murder. Link's statements to police after her arrest and her testimony at her own trial were introduced at defendant's trial after Link herself refused to testify. Defendant appeals from his conviction on several grounds, including a claim that the introduction of Link's prior testimony at his trial was reversible error. We affirm.

Defendant's conviction stems from the fatal burning of Lueberta Davis and her two children, Tesa and LaMarr, in their duplex apartment on January 19, 1978. Ms. Davis and Tesa were tied to a bed frame and a fire was started with flammable liquid which killed all three.

Defendant had been living with Davis prior to October 11, 1977, when he was incarcerated on a charge of attempted aggravated robbery of a Red Owl store earlier that day. After the attempted robbery, defendant had returned to the Davis home and sent Davis and Tesa to the Red Owl Store to pick up his car. Davis and Tesa were apprehended by the police when they attempted to recover the car and, upon

1. *See, State v. Link,* 289 N.W.2d 102 (Minn.1979).

questioning, Tesa blurted out that James had sent them and was waiting back at the Davis apartment. As a result, defendant was arrested at the Davis apartment. Davis was in a squad car in front of the apartment at the time of his arrest.

Defendant was also charged with several other robberies which had occurred in the area. In one of these, a woman named LoAnn Martin was a codefendant. She made a statement to police implicating defendant as well as herself, and agreed to testify against defendant. Defendant's response was to contact another inmate, Charles Thomas, and promise to post bail for Thomas if he would kill Martin with the help of Jean Link. Thomas was unable to get out on bail because a hold and $10,000 bond were placed on him.

Apparently, defendant also feared that Davis would testify against him. According to Davis' sister, Chatton Bolden, defendant spoke to Davis in an agitated and angry manner at her hearing on charges of aiding an offender to avoid arrest. In January, 1978, Black asked Lingwall, another inmate, if he knew how to "burn up a house with people inside so no one could get out of there." Defendant stated that he wanted to get rid of a lady. Earlier, defendant told Sayres, also an inmate, that he wanted Davis' house burned to prevent her from testifying against him, and offered to post Sayres' bail if he would do it. Black told Elliot, a third inmate, that he was afraid that Davis would testify against him and that he would have to "off her" and "burn the bitch up." Elliot made phone calls to both Link and Davis for defendant, including several messages to Link to go ahead and do what he had told her to do.

Link had met defendant while working in an internship program as a correctional counselor at Stillwater State Prison, where defendant was incarcerated, in 1976. They became romantically involved, and went through a marriage ceremony at the prison which Link thought was valid and which Black referred to as a mock ceremony. Link had a child by Black. The evidence indicates that Link was very dependent on Black, and continued to hope for a normal marriage relationship with Black even though he misused her and seldom saw her after he was released.

According to Link's testimony, defendant contacted her on January 9, 1978, and asked her to find someone to kill a girl. Link told her friends, the Johnsons, that Black wanted the woman killed because she "had evidence against him that would put him away for twenty years." On January 12, Black called Link and told her to buy two cans of gasoline, go to the Davis apartment to spend the night (Black would arrange this with Davis), and spread the gasoline and set the house on fire while Davis and the children were sleeping. Link bought the gasoline and went to the house, but became uncomfortable and left. Link realized that defendant had been living with Davis and was determined to break away from the relationship, but she soon began cooperating with him again. Defendant had gotten another inmate, Olson, to commit the murder upon his release from jail. Link talked to Olson at his release on January 19, and arranged to contact him that evening. Link claims that she believed Olson was only going to burn some evidence for defendant at the Davis residence. Link picked Olson up at a friend's apartment in Golden Valley about 7:30, drove to the Davis apartment, and waited in the car while Olson took the gas from her car and went into the house. When he returned a half-hour later, his pants were on fire and his down jacket was burned and spilling feathers. Link dropped Olson off at another friend's apartment in Mounds View. One witness saw Olson running from the house and identified Link's car pulling away from the curb at the time the fire began. When firemen finally controlled the fire in the duplex, they found the three bodies in the bedroom. Two gas cans were found near the victims.

After the fire, defendant showed inmate Elliot a newspaper story about the fire and said to him, "Do you see what I mean?" When defendant was charged with the three murders, he told Elliot, "[T]hese [ex-

pletive deleted] can't convict me of a crime, I am in jail * * *. They are as crazy as hell if they can convict me." Defendant added that he should change his name to Charles Manson because of his power over other people.

Defendant raises five separate issues on this appeal:

(1) Was defendant's right to a fair trial violated when the state called Link to testify and Link refused to do so in front of the jury, when the state had prior knowledge that Link might well refuse to testify?

(2) Did the introduction of Link's prior statements and testimony at defendant's trial violate the hearsay rule or defendant's right to confront witnesses against him?

(3) Was it error for the trial court to allow the prosecution to introduce evidence of robberies for which defendant had been charged but not convicted?

(4) Were hearsay statements made by Link and Olson during the course of the alleged conspiracy improperly admitted because the prosecution failed to introduce sufficient independent evidence of the conspiracy?

(5) Were communications from defendant to the jail chaplain improperly admitted because they were privileged under Minn. Stat. § 595.02(3) (1978)?

1. Defendant argues that because Link refused to answer questions at a hearing in chambers before being called as a witness in front of the jury, the prosecution knew she wouldn't testify and therefore acted in bad faith by later calling her to the witness stand in front of the jury. Defendant claims that the prosecution's motive must have been to prejudice the minds of the jury and that, under *State v. Mitchell*, 268 Minn. 513, 130 N.W.2d 128 (1964), defendant was entitled to a new trial.

This court, in *State v. Mitchell, supra*, held that when the prosecution calls a codefendant as a witness, *knowing* that the codefendant will claim a privilege and refuse to testify, reversible error results, regardless of actual prejudice. When the witness is called in good faith, the question

arises whether the prosecution's examination is of a type that has prejudiced the defendant to the extent that he has been denied a fair trial. 268 Minn. at 517, 130 N.W.2d at 131.

In the instant case, although Link had refused to testify at Olson's trial and although she claimed in chambers that she wouldn't answer any questions, Link had stated under oath at her own trial that she would testify in this case. Furthermore, Link had no valid privilege under which she could refuse to testify, and her refusal put her in contempt of court. Under these circumstances, it is fair to say that the prosecution called her to determine with certainty whether or not she would testify and, if not, to lay a foundation for the introduction of her prior statements and testimony. In addition, as in *State v. Mitchell, supra*, the prosecution's questions were brief. Indeed, the prosecutor only questioned Link at all after the trial court instructed him to do so. Most of the questions put to Link before the jury were asked by the trial court and by Link's attorney. The judge apparently wanted to assure himself that Link would refuse to testify in front of the jury and that she knew she had no valid privilege and would be in contempt of court. Link's attorney thought it was important that Link refuse to testify in front of the jury before sanctions for contempt of court were imposed.

For the above reasons, the calling of Link as a witness in front of the jury was not done in bad faith by the prosecution. Further, the prosecutor's examination was not of a type that prejudiced the defendant to the extent that he was denied a fair trial. The prosecution's questions were brief. The jury was not left to speculate as to what Link's testimony might have been, because her earlier statements were introduced into evidence. Defendant argues that because Link refused to testify and then her statements were introduced, the jury must have concluded that her oral testimony in this case would have been even more damaging to defendant than her prior statements. This is speculation on defend-

ant's part; moreover, given the circumstances of the case and the motive imputed to defendant for murdering the Davis family, *i. e.*, to prevent damaging testimony, it would seem more plausible to believe that Link refused to testify out of fear than because she would have revealed something more damaging to defendant than she did under oath at her own trial. Finally, defendant argues that because Link's refusal occurred near the beginning of the trial and took some time, it was especially noted by the jury and thus prejudicial. Contrary to this, however, is the fact that the trial lasted a considerable period of time after this exchange; that Link's prior statements were introduced; and that considerable other, corroborating evidence was also introduced. All of these factors lessened the impact of Link's refusal. Therefore, we find that the circumstances of Link's refusal were not so prejudicial as to require a new trial.

2. Two statements made by Link to the police after her arrest and her testimony at her own trial were introduced to prove the truth of the matters asserted. As such, they were clearly inadmissible hearsay under Minn.R.Evid. 801(c) unless they fall within an exception to the hearsay rule. The trial court held that Link's statements were admissible as statements against penal interest.

Rule 804(b)(3) provides in part that if a' declarant is unavailable as a witness,[2] his statement may be introduced as a statement against interest if the statement "at the time of its making \* \* \* so far tended to subject him to civil or criminal liability \* \* \* that a reasonable man in his position would not have made the statement unless he believed it to be true."

■ The trial court did not abuse its discretion in ruling that Link's testimony and statements to police qualify as statements against penal interest. They inculpate Link

as well as Black and Olson, and reveal details of the conspirators' plans and actions. Link's statements were not really self-serving: she claims, especially at her trial, that she did not know that Olson was planning to murder Davis, but most of the information given by Link deeply involves her in the plans and makes it almost incredible that Link did not know what Olson and Black intended to accomplish. Link received no promises of leniency from the state or from the police for her statements. At Link's own trial, her statements and testimony at least in part led to her own jury conviction for murder; it would be difficult to see how these statements could not be regarded as statements against her interest.

■ Defendant argues that even if some portions of Link's statements were against her penal interest, the trial court should have admitted into evidence only those portions which were against her interest. This approach has been used to deal with statements which are not wholly against interest,[3] but it is not a mandatory approach, and in the instant case it would not be practical: Link's statements are predominantly inculpatory, and it would be almost impossible to coherently edit out those portions of her statements which are not against her interest.

■ Defendant also claims that the admission of Link's statements after she refused to testify and thus was unavailable for cross-examination violated his state and federal constitutional right to confront the witnesses against him. The right of confrontation is a fundamental right under both constitutions. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *State v. Shotley*, 305 Minn. 384, 233 N.W.2d 755 (1975). The introduction of a codefendant's statements in lieu of live testimony can be a violation of the right of

2. "Unavailability as a witness" is defined by Rule 804(a)(2) to include situations in which the declarant "persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so." De-

fendant agrees that Link is unavailable as a witness.

3. *See*, McCormick, *Evidence*, § 279 at 677 (2d ed. 1972).

confrontation. *State v. Gruber*, 264 N.W.2d 812 (Minn.1978).

■ In this case, the trial court held that defendant had waived or forfeited his right to confront Link because he had intimidated her into silence. The law is clear that if a witness is unavailable because of the wrongdoing of the defendant, the defendant cannot complain if other competent evidence is introduced to take the place of the witness' testimony. *Reynolds v. United States*, 98 U.S. 145, 158, 25 L.Ed. 244 (1878). In *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), when a witness refused to testify because of the defendant's threats, the court of appeals held that the witness was unavailable, and his prior grand jury testimony was admissible against the defendant because the defendant was deemed to have waived his right to confrontation. The court stated:

> The Sixth Amendment does not stand as a shield to protect the accused from his own misconduct or chicanery. * * * To permit the defendant to profit from such conduct would be contrary to public policy, common sense and the underlying purpose of the confrontation clause.

547 F.2d at 1359. *See, also, U. S. v. Balano*, —— F.2d ——, filed December 18, 1979 (10th Cir. 1979). It should logically follow that none of the participants in a conspiracy should profit from the misconduct of any of the other participants (*see, State v. Olson*, 291 N.W.2d 203, filed herewith).

■ In the instant case, Link stated that she would not testify because she feared that she or her child would be harmed by Black or his friends if she did so. In one of her earlier statements to the police, Link said that Black told her that he would kill her if she didn't do what he told her to do. Black made other threats against Link at various times; for example, Link testified that on January 13, after she had visited the Davis home but left early

and failed to start the fire, a man sent by Black came to her apartment, slapped her around, and told her that if she didn't do what defendant asked, the man would make sure that his next trip was his last.

Defendant's motive for killing the Davis family, that he was afraid Davis would testify against him on the robbery charges, provided Link with the most graphic and explicit threat possible if she testified against him. Her own participation in Davis' murder, which took place while defendant was in jail, made Link realize that if she testified against him at his trial, her life would be in danger. Link stated at her own trial, "I mean, if he'd kill her [Lueberta] just because she was going to testify against him for a robbery, what was he going to do to me if I knew about him murdering somebody?"

Certainly Link's fear was rational. Under the circumstances, the trial court was correct in ruling that defendant forfeited his right to confront Link at his trial because of his own wrongdoing.

3. At trial, the prosecution was permitted to introduce charges pending against defendant arising out of four separate robberies: the attempted Red Owl robbery on October 11, 1977; robbery of an Embers restaurant on September 15; robbery of a Superamerica station on September 21; and the attempted robbery of a Gunkelman's store on July 6. Defendant challenges the admissibility of the Gunkelman's and Superamerica charges.[4]

■ As a general rule, evidence of other crimes is not admissible to prove the character of a defendant or his guilt in the offense charged. *State v. Titworth*, 255 N.W.2d 241 (Minn.1977); Minn.R.Evid. 404(b). It may be admissible for other purposes, however, such as to demonstrate motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Rule 404(b). In this case, the trial court permitted the prosecution to in-

---

4. Defendant concedes that the Red Owl and Embers charges were admissible under Minn.R. Evid. 404(b), as establishing motive or a common scheme or plan, because Davis and LoAnn

Martin, respectively, had first-hand knowledge of these two crimes and defendant had made threats at various times that he would kill them to prevent them from testifying against him.

troduce into evidence the other robberies with which defendant had been charged because they tended to establish the relationship between defendant and the victims and to demonstrate defendant's motive for the murders. Defendant claims that any such probative value the charges might have is outweighed by their prejudicial effect on the jury, and therefore they were inadmissible.

It is almost certain that Davis knew of the other charges against defendant when she entered her plea to charges of aiding an offender to avoid arrest. The robberies took place within a relatively short period of time, and defendant was not charged with any of them until he was arrested subsequent to the Red Owl robbery, after Tesa Davis had given information to the police. Tesa's statements thus indirectly resulted in all four of the charges against defendant. Davis' possible testimony against him on four robbery charges makes defendant's motives of revenge and of silence more comprehensible than if only one charge was involved.

Against this probative value must be weighed the prejudice to defendant from the introduction of the two additional robbery charges. Given the facts that two robbery charges were concededly admissible, that defendant was on trial on three counts of first-degree murder, and that the other testimony and evidence against him was substantial, it would not seem to be an abuse of discretion for the trial court to hold that the probative value of the two additional robbery charges, as tending to establish defendant's motive and the relationship between defendant and the victims, outweighed their prejudicial value.

Defendant also argues that the introduction of three of the robbery charges against him (excluding the Red Owl charge) was reversible error because no formal written notice was filed with the trial court, as required by *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965), and as codified in Minn.R.Crim.P. 7.02. Rule 7.02 requires the prosecutor to notify defendant in writing of any additional offense which will be offered as evidence at trial under any exceptions to the general exclusionary rule. Notice was not given in this case.

■ However, the trial court held that the three robbery charges were admissible without written notice under *State v. Martin*, 293 Minn. 116, 197 N.W.2d 219 (1972). In *Martin*, this court held that Spreigl notice is not required when the prosecution seeks to introduce evidence of other criminal acts by the defendant to show his motive for the commission of the offense charged, notwithstanding that such evidence tends to prove a separate offense. 293 Minn. at 128, 197 N.W.2d at 226. And in *State v. Boyce*, 284 Minn. 242, 170 N.W.2d 104 (1969), this court stated:

> We did not intend by our decision in *State v. Spreigl* * * * to require a 'Spreigl notice' as a condition to the admissibility of evidence bearing directly on the history of the relationship existing between one accused of murder and the victim.

284 Minn. at 260, 170 N.W.2d at 115 (citations omitted). *See, also, State v. Marsyla*, 269 N.W.2d 2 (Minn.1978).

As discussed above, the trial court admitted evidence of the robbery charges on the grounds that they established defendant's motive for the crimes and the relationship between defendant and the victims. Under the circumstances of this case, this was not an abuse of discretion. On these grounds, the charges were admissible without written notice under *Boyce* and *Martin, supra.*

■ 4. Defendant argues that statements made by Link and Olson to others were inadmissible hearsay. The trial court admitted them under R.Evid. 801(d)(2)(E), which states:

> A statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy.

The co-conspirator exception is only available if the prosecutor produces independent evidence to establish the existence of the conspiracy. The trial court ruled that in

this case sufficient independent evidence was introduced. Defendant challenges this ruling.

■ Independent evidence need only be sufficient to make a prima facie showing of the existence of the conspiracy to allow in statements of co-conspirators. *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490, *cert. denied,* 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966); *State v. Guy,* 259 Minn. 67, 105 N.W.2d 892 (1960). It is not necessary that the evidentiary conspiracy be established by direct evidence; it must often be proved inferentially and circumstantially because of the very nature of a conspiracy. *See, State v. Kahner,* 217 Minn. 574, 15 N.W.2d 105, *cert. denied,* 323 U.S. 768, 65 S.Ct. 121, 89 L.Ed. 614 (1944); *State v. Connelly,* 249 Minn. 429, 82 N.W.2d 489 (1957). In the instant case, there is substantial independent evidence of a conspiracy between Black, Link, and Olson. Certainly it is sufficient to make a prima facie showing. We conclude that the trial court did not abuse its discretion in ruling that the prosecution had made a prima facie showing of conspiracy through independent evidence.

5. The prosecution was permitted to introduce Reverend Roberts' testimony at trial. Roberts was the chaplain at Hennepin County Jail. He testified that on January 19, 1978, defendant asked Roberts to phone Link and Davis and arrange visits from them to defendant that day. Defendant also asked Roberts to call Link and tell her to "go ahead and carry out their plans."

■ Defendant asserts that Roberts should not have been allowed to testify because these communications were privileged under Minn.Stat. § 595.02(3) (1978). This statute provides in part: "[N]or shall a clergyman or other minister of any religion be examined as to any communication made to him by any person seeking religious or spiritual advice, aid, or comfort * * * without the consent of such person." Defendant claims that because he was seeking the "aid" of Roberts, his communication is privileged. However, the wording of the statute indicates that "religious or spiritu-

al" modifies "advice, aid, or comfort," not just "advice." Thus, the aid requested of Roberts must be religious aid to be privileged. This reading of the statute is supported by *Christensen v. Pestorious,* 189 Minn. 548, 250 N.W. 363 (1933), in which a witness to an accident discussed the accident with her clergyman and sought to have her statements protected by this privilege. This court rejected her contention, stating: "The pastor received nothing but an ordinary description of the occurrence. This witness was not seeking spiritual advice or consolation or making a confession. What she said was not penitential or in confidence." 189 Minn. at 552, 250 N.W. at 365. *See, also, State v. Lender,* 266 Minn. 561, 124 N.W.2d 355 (1963).

■ It is clear in this case that defendant was not seeking religious or spiritual aid from Roberts. In addition, the communications were not made with the expectation that they would be confidential. This is an implicit requirement of the clergyman's privilege. *In re Swanson,* 183 Minn. 602, 605, 237 N.W. 589, 591 (1931). Instead, defendant wanted to have the communications repeated to others. This alone would render the communications not privileged. *In re Swenson, supra;* *Hills v. State,* 61 Neb. 589, 85 N.W. 836 (1901).

Affirmed.