STATE of Minnesota, Respondent,

v.

Eddie Ralph IVERSON, Appellant.

No. C3–86–68.

Court of Appeals of Minnesota.

Nov. 18, 1986.
Review Denied Jan. 16, 1987.

Hubert H. Humphrey, III, Atty. Gen., Janet A. Newberg, Sp. Asst. Atty. Gen., St. Paul, Fred R. Kraft, Mower Co. Atty., Austin, for respondent.

C. Paul Jones, Public Defender, Jonathan G. Steinberg, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J., and LANSING and CRIPPEN, JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

This appeal questions whether Eddie Ralph Iverson's conviction for aiding and abetting a crime can be upheld when an alleged accomplice is subsequently acquitted by a separate jury. We also consider whether the evidence was sufficient for the jury to find that Iverson committed the crime and whether the trial court erred in admitting various pieces of evidence over defendant's objection. We affirm.

## FACTS

Rodney Ray Sash was found shot to death in a cornfield near Lansing Township, Minnesota in Mower County, on October 4, 1984. Sash was a resident of the area who performed custom farming work. Prior to his death Sash was experiencing financial difficulties and was selling street drugs to supplement his income.

Eddie Ralph Iverson and Earl Harvey Rand lived in Mower County near Brownsdale, Minnesota. They shared a house with Iverson's girlfriend, Kim Harris, and Rand's wife, Laurie Rand. Iverson and Rand were members of a local motorcycle club. In 1984, Rand was the president of the club and Iverson was a past president. Iverson and Rand frequently purchased and sold cocaine and marijauna.

Eddie Ralph Iverson was charged with the murder of Sash on a three count indictment; murder in the first degree with premeditation, murder in the first degree while committing aggravated robbery, and conspiracy to commit murder in the first degree.

The case against appellant was based on circumstantial evidence. The state introduced evidence to prove their theory that Iverson and Rand had robbed and killed Sash during a planned exchange of large amounts of marijuana for cash and cocaine. In the afternoon of October 4, 1984, Rodney Ray Sash was found dead, lying outside of his truck with four gunshot wounds. When the police arrived they found both doors of the truck open. A triple beam scale, which Sash used to weigh cocaine, was sitting on top of the open glove compartment lid. Sash obtained twelve ounces of cocaine in the week preceding his death. Six ounces of this was obtained only the evening before he died. The morning of his death Sash arranged to obtain $1700 in cash from a local farmer. The money was partial payment of Sash's wages for custom farming work performed. Only $2.00 in cash and a very small amount of cocaine were found on Sash or in the vicinity of his truck when the police arrived at the scene. Evidence indicated Sash lived in his truck so that if the money or cocaine were in his possession they would have been either on his person or in his truck.

Approximately one week before his death, Sash told at least three persons that he was going to make a major deal to exchange cocaine and cash for marijuana. Sash inquired of one person as to whether Iverson and Rand could come up with fourteen or fifteen pounds of marijuana. Around the first of October, Eddie Ralph Iverson had thirteen pounds of marijuana. On October 3, Iverson told a friend that he had lots of cocaine coming in.

The police never recovered the weapon used to kill Sash. A crime laboratory analyst testified that the bullets recovered from Sash's body were "closely associated" to bullets found in a box in the Rand/Iverson household. The type of bullets recovered from Sash's body are used in only two types of weapons. During the preceding six months, Iverson and Rand were in possession of one gun that used this type of ammunition, and Rand owned a different gun that used the same ammunition.

On September 28, 1984, Iverson took Sash to a friend's house. Iverson introduced Sash to the friend because Sash had some cocaine he wanted to sell and the friend was a prospective buyer. The friend declined to purchase because of the drug's poor quality. A little while later Sash returned to the house alone to again attempt a sale, this time offering the friend a discount on the drug by eliminating Iverson from the profit. Iverson called the house while Sash was there and Iverson became upset with Sash's attempt to cut Iverson out of the deal. After Sash's death Iverson told the same friend that Sash had tried to cut him out of deals before the evening of September 28, 1984.

One to two weeks prior to Sash's murder, Iverson, Rand, Kim Harris, and Laurie Rand discussed a plan to rob Sash. Iverson and Harris testified at trial that the conversation occurred. Joann Stevens, Sash's girlfriend, testified she overheard the conversation and that Earl Harvey Rand stated he would just as soon see Sash dead. Laurie Rand told Sheriff Goodnature that during the conversation Laurie said they might have to hurt Sash, that Sash would not give up without a fight. In contrast to Laurie Rand and Steven's testimony, Kim Harris testified there was no talk of hurting or injuring Sash.

On the day Sash died, a local farmer was working in a field directly across from the cornfield where Sash's body was found. The farmer saw an orange squareback car and a truck drive into the cornfield. The farmer's description of the car matched Iverson's car. The farmer later identified Iverson's car as the same car he saw driving into the field on October 4, 1986. Iverson told police he was the only person who used the car on that day.

The time of Sash's death is uncertain. The medical examiner estimated death at around 1:00 p.m. Witnesses at trial testified they saw Sash the afternoon of October 4. Based on his investigation of the case, Sheriff Goodnature concluded the

time of death was in the morning of October 4.

The time of death was important in determining Iverson's guilt or innocence because Iverson's alibi was that he and Harris moved to Wisconsin on October 4, 1984, and that they left Mower County around noon on that day. Other witnesses testified they saw Iverson in Wisconsin in the afternoon and evening of October 4. The state, on the other hand, attempted to show that appellant left Minnesota suddenly on the 4th of October, and thus raised the question of whether appellant was fleeing from the crime. While Iverson contended the move was expected, Harris testified they did not leave with suitcases or other luggage.

Approximately one week after Sash died, Iverson met with the same friend that Iverson and Sash had tried to sell cocaine to on September 28. The friend testified Iverson was using the same athletic bag Sash had during the earlier visit, that the cocaine was very similar in taste and unique consistency to the cocaine Sash tried to sell earlier, and that Iverson had a cocaine grinder that was identical to the grinder Sash had used. The defense introduced evidence to show the bag and grinder that Iverson had with him were not the same items Sash was using during the earlier visit.

Following a three week trial, Iverson was convicted of aiding second degree murder while robbing Sash. His alleged accomplice, Earl Harvey Rand, was later acquitted of all charges in a separate trial.

**ISSUES**

1. Does the subsequent acquittal of an alleged accomplice require reversal of appellant's conviction for aiding murder in the second degree?

2. Was the evidence sufficient to sustain appellant's conviction for aiding murder in the second degree?

3. Do the trial court's evidentiary rulings constitute reversible error?

**ANALYSIS**

1. Appellant was convicted on August 31, 1985. On February 7, 1986, a separate jury acquitted Earl Harvey Rand of all charges. Appellant asserts that fundamental fairness requires the reversal of his conviction for aiding and abetting where the alleged accomplice is acquitted.

The Minnesota Supreme Court specifically rejected this argument in *State v. Cegon*, 309 N.W.2d 313, 314 (Minn.1981). In *Cegon*, the court stated:

> Contrary to what defendant argues, the fact that a different jury subsequently acquitted the man he was accused of aiding and abetting would not render defendant's conviction for aiding and abetting improper.

*Id.* Appellant claims *Cegon* is distinguishable because in *Cegon* the defendant was convicted of both aiding and abetting and of actually committing the offense. However, the court specifically stated that even if the defendant were convicted only of aiding and abetting the crime, the court would still affirm Cegon's conviction in the face of his accomplice's acquittal. *Id.* *Cegon* is consistent with the rule adopted by the United States Supreme Court; acquittals of criminal accomplices have no effect on the convictions of others because application of the doctrine of nonmutual collateral estoppel is not warranted in criminal cases. *Standefer v. United States*, 447 U.S. 10, 23–24, 100 S.Ct. 1999, 2007–08, 64 L.Ed.2d 689 (1980).

2. The standard for reviewing the sufficiency of the evidence in a criminal case is stated in *State v. Ulvinen*, 313 N.W.2d 425 (Minn.1981).

> [The court] must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume

that the jury believed the state's witnesses and disbelieved any contrary evidence. *Id.* at 428 (citations omitted).

The testimony at trial was sufficient for the jury to infer that appellant killed Sash during the commission of a felony. At trial the state pointed to five categories of evidence to support their charge that appellant and Earl Harvey Rand killed Rodney Sash. First, various witnesses indicated Iverson and Rand planned a drug deal with Sash to occur the same day Sash died. Second, evidence demonstrated Iverson knew Sash tried to sell drugs directly to Iverson's customers, thereby denying Iverson any percentage on the sale, and that Iverson was upset with this. Third, Iverson admitted he participated in a conversation with Earl Harvey Rand, Laurie Rand, and Kim Harris, during which they discussed a plan to rob Sash. Harris also testified the conversation occurred. Sheriff Goodnature testified Laurie Rand admitted that a plan to rob Sash was discussed. One witness who overheard the conversation testified Earl Harvey Rand said he thought Sash was not treating them fairly and he would just as soon kill Sash. Fourth, a local farmer testified he saw a car driving from the road into the cornfield on the day of Sash's death and the farmer's description of the car matched Iverson's car. The farmer later identified Iverson's car as the one he observed, and Iverson said to police that no one else used his car on the day Sash died. Fifth, although the murder weapon was never found, there was sufficient evidence for the jury to conclude that the bullets recovered from Sash's body were from the same box of bullets found in the Iverson/Rand household. Further, Iverson and Rand were in possession of two guns that used these bullets.

A jury may find a criminal defendant guilty of a crime based on circumstantial evidence.

[C]ircumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt.

*State v. Berndt,* 392 N.W.2d 876, 880 (Minn.1986) (quoting *State v. Jacobson,* 326 N.W.2d 663, 666 (Minn.1982)). The circumstantial evidence presented in this case is consistent with the hypothesis that the accused is guilty. Appellant relies primarily on his alibi to assert there was circumstantial evidence consistent with a rational hypothesis other than that of appellant's guilt. However, the jury was required to determine the credibility of witnesses testifying on behalf of Iverson and his whereabouts on the 4th of October. The jury is in the best position to evaluate the circumstantial evidence presented at trial, and its verdict is entitled to due deference. *State v. Race,* 383 N.W.2d 656, 662 (Minn.1986). Based on the evidence, the jury could have concluded either that Sash was killed in the morning before Iverson left for Wisconsin, or that Sash was killed in the afternoon and Iverson was still in town at that time. We conclude there was sufficient evidence for the jury to conclude that the circumstances proved were inconsistent with any rational hypothesis except that of guilt.

3. A trial court has wide discretion in admitting evidence at trial, and its evidentiary rulings will not be found erroneous absent a clear abuse of discretion. *State v. Edwards,* 380 N.W.2d 503, 508 (Minn.Ct. App.1986).

A. Evidence of weapons and ammunition used by appellant and the alleged co-conspirators.

Appellant claims the trial court abused its discretion by admitting into evidence extensive testimony of weapons, gun magazines, target practice, gun shows, and use of weapons. Appellant claims this evidence was irrelevant because it was unconnected to the offense charged.

In *State v. Daniels,* 361 N.W.2d 819 (Minn.1985), the Minnesota Supreme Court set out the standard for determining whether weapons are admissible in a criminal trial:

A weapon is admissible in a criminal case if it has some relevance to the issues in the case, but it is not admissible if its only purpose is to create suspicion in the minds of the jurors that because a defendant owns a gun he is likely to commit crimes. Physical evidence is admissible if it connects the defendant to the crime.

*Id.* at 827 (citations omitted).

■ The gun used to kill Sash was never found, and therefore evidence concerning the bullets, type of weapon, and Iverson's access to both was relevant to the state's burden of proving Iverson's guilt. The trial court admitted evidence that supported the state's position that Iverson had access to multiple guns that used the same type of ammunition that was recovered from Sash's body. The state introduced evidence of a derringer found in the possession of appellant and Earl Harvey Rand a month before Sash's death. This derringer, although eliminated as a murder weapon, used the same type of ammunition that was used to kill Sash. The state also introduced into evidence a mini 14 (referred to as a tommy gun). This evidence was introduced in connection with testimony that Rand had a .357 caliber Ruger in his possession at a trade show. Rand attempted to trade the Ruger for the mini 14 but, when unsuccessful, retained the .357 caliber and purchased the mini 14 with cash. The .357 caliber Ruger was one of two types of guns that use the same type of ammunition found in Sash's body. Rand's Ruger was never recovered and the evidence was admitted to show that Rand possessed a weapon shortly before the murder that could have been the murder weapon.

■ The state also introduced evidence that Iverson belonged to a motorcycle group and that members of the group engaged in target practice where handguns were passed back and forth among members. We conclude this evidence was admissible for the purpose of showing that Iverson had easy access to handguns that used the same type of ammunition found in Sash's body.

■ Further, the evidence was probative of the existence of a conspiracy to murder Sash. As previously noted, the state charged both Iverson and Rand with conspiracy, and the police were investigating other potential accomplices at the time of Iverson's trial. In *State v. Webber,* 292 N.W.2d 5, 9 (Minn.1980), the Minnesota Supreme Court upheld the admissibility of evidence relating to weapons that were accessible to the accused as probative of the conspiracy between the accused and his alleged accomplice. This case, like *Webber,* involves a charge of conspiracy. Each piece of weapon evidence not only shows Iverson's access to handguns, but was also relevant to the charge that Iverson conspired with Rand to murder Sash. We conclude the evidence connected the defendant to the crime charged and was furthermore probative of the existence of a conspiracy.

B. Statement of a co-conspirator.

■ Appellant claims that the trial court erred in admitting the statements of co-conspirator Earl Harvey Rand. A statement is not hearsay if it is made by a co-conspirator during and in furtherance of the conspiracy. Minn.R.Evid. 801(d)(2)(E). The Minnesota Supreme Court has held that such statements should not be admitted until a prima facie showing of the conspiracy is made, and the existence of the conspiracy may not be proved by the hearsay statements of the alleged co-conspirators. *State v. Thompson,* 273 Minn. 1, 16, 139 N.W.2d 490, 503 (1966), *cert. denied,* 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966).

The trial court specifically found a prima facie case of conspiracy prior to admission of Rand's statements. Furthermore, there was sufficient independent evidence for the trial court to find the existence of the conspiracy. Extensive evidence was introduced concerning plans of Iverson and Rand to conduct a drug deal with Sash. In addition, two witnesses testified to the plans to rob Sash, one of the witnesses

further testifying that Rand stated he would just as soon kill Sash. The trial court did not err in admitting the co-conspirator's statements.

### C. Statements of Laurie Rand.

Appellant objects to the introduction of out-of-court statements of Laurie Rand, Earl Harvey Rand's wife. Laurie Rand refused to testify at appellant's trial on the grounds of adverse spousal relations. Her statements were admitted through the testimony of Sheriff Wayne Goodnature and Judienne Tabor, Laurie Rand's friend. Sheriff Goodnature testified that Laurie Rand told him on December 12, 1984 that she participated in a conversation with her husband, appellant, and Harris, in which they discussed plans to rob Sash. Tabor testified that Laurie Rand arrived at Tabor's house on the morning of October 4, 1984, and told Tabor that her husband had kicked her out of the house so that he could do a drug deal.

The rules of evidence provide that certain out-of-court statements may be introduced into evidence if the declarant is unavailable. Minn.R.Evid. 804. Unavailability includes situations in which the declarant refuses to testify concerning the statement despite a court order to do so. *Id.* at (a)(2). The court ordered Laurie Rand to testify and found her in contempt of court when she refused. Thus, Laurie Rand was unavailable as that term is defined in the rule.

Laurie Rand's statements were admissible pursuant to the hearsay exception for statements against interest:

> A statement which was at the time of its making * * * so far tended to subject [her] to civil or criminal liability, * * * that a reasonable [person] in [her] position would not have made the statement unless [she] believed it to be true.

Minn.R.Evid. 804(b)(3). Sheriff Goodnature testified that Laurie Rand stated that she participated in the conversation by discussing the likelihood of success of one strategy and a possible alternative strategy. Laurie Rand's statements were against penal interest in that her contribution to the discussion exposed her to criminal liability as a conspirator to the crime of aggravated robbery.

We recognize that statements made to a police officer are viewed more suspiciously than other statements against penal interest. *State v. Hansen*, 312 N.W.2d 96, 101 (Minn.1981). However, the reason for the policy of applying stricter review to such statements are not present here. Nothing in the trial record indicates that Laurie Rand received promises of leniency from the state or from the police in exchange for her statements. In *State v. Black*, 291 N.W.2d 208, 213 (Minn.1980), the Minnesota Supreme Court held that the trial court did not abuse its discretion in admitting the co-conspirator's statements against penal interest made to the police. In *Black* the co-conspirator's statements were inculpatory, revealed details of the conspiracy, were not self-serving statements (i.e. were not exculpatory), and were not accompanied by promises of leniency. *Id.* Each of the factors relied upon in *Black* are also present in this case.

Out-of-court statements introduced in a criminal trial are subject to not only the rules against hearsay but also the defendant's constitutional right to confront witnesses testifying against him. A two-step analysis is required to determine whether such evidence violates the confrontation clause. *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980). First, the necessity of the hearsay declaration must be addressed. Second, the reliability of such declarations must be examined. *Id.* The requirement of necessity is fulfilled by a showing that the declarant is unavailable. *Hansen*, 312 N.W.2d at 102. Laurie Rand's refusal to testify fulfills this requirement. *See* Minn. R.Evid. 804(a)(2).

As to the second requirement, that the statements are sufficiently reliable, it is significant that the statements were against Laurie Rand's penal interest and admissible under one of the exceptions to

the hearsay rule. *See Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. In addition, Laurie Rand voluntarily discussed the conversation with Sheriff Goodnature at a local bar on December 12, 1984. The conversation was recorded by use of a transmitter worn by Goodnature. Two police officers in a nearby van simultaneously recorded the conversation. At trial, Sheriff Goodnature read directly from the relevant portions of the transcript made from the tape recording.

Moreover, although the statement was introduced to inculpate the defendant, the statement also inculpated Laurie Rand and her husband. Finally, Laurie Rand's statements were corroborated by three other persons who participated in or overheard the conversation, including the defendant himself.

The trial court decision to admit the testimony of Judienne Tabor is more questionable. Tabor's testimony included a statement by Laurie Rand, on the morning of October 4, 1984, that Rand's husband kicked her out of the house so that he could do a drug deal. Respondent contends the statement was an excited utterance. We disagree. *See State v. Page,* 386 N.W.2d 330, 333–34 (Minn.Ct.App.1986), *pet. for rev. denied,* (Minn. June 30, 1986). While admission of the statement may have been erroneous, it was of remote significance, harmless and not reversible error.

D. Statements of the deceased, Rodney Sash.

Appellant's last evidentiary claim is that the trial court erred in admitting the statements of the deceased. The State introduced statements of the deceased from three different occasions where Sash implied that he was preparing for a large drug deal between himself, appellant and Earl Harvey Rand. The statements were hearsay. *See* Minn.R.Evid. 801(c). However, the statements were admissible pursuant to the exception for statements of the declarant's then existing state of mind. Minn.R.Evid. 803(3). The rule provides that a statement of this kind, regarding subjects such as intent, plan, motive, or design, are not excluded by the hearsay rule. *Id.* The trial court did not abuse its discretion when it determined that the intentions of the decedent prior to his murder were admissible as the declarant's state of mind.

### DECISION

Appellant is not absolved of the conviction based on later acquittal of an accomplice. The conviction of appellant is adequately supported by the evidence. With one exception, challenged evidence was properly admitted; questionable admission of one hearsay statement was harmless.

Affirmed.