STATE of Minnesota, Appellant,

v.

Earlhue (NMN) THOMPSON, Respondent.

No. C1–87–1018.

Court of Appeals of Minnesota.

Oct. 20, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert Johnson, Anoka Co. Atty., Thomas G. Haluska, Asst. Anoka Co. Atty., Anoka, for appellant.

C. Paul Jones, State Public Defender, Minneapolis, Steven P. Russett, Asst. State Public Defender, St. Paul, Stephen R. Nicol, Anoka Co. Public Defender, Minneapolis, for respondent.

Heard, considered and decided by NORTON, P.J., and MULALLY* and LOMMEN,* JJ.

## OPINION

A. PAUL LOMMEN, Judge.

This is an appeal by the state from a pretrial order suppressing a statement made to police by respondent Earl Thompson's present wife, Debbie Thompson, then known as Debbie Perunovich. Respondent is charged with theft by aiding and abetting welfare fraud, Minn.Stat. §§ 256.98 and 609.05, subd. 1 (1986). We affirm.

* Acting as judge of the Court of Appeals by ap-    pointment pursuant to Minn. Const. art. 6, § 2.

## FACTS

Respondent Earlhue Thompson was arrested on December 9, 1986 in the apartment of Debbie Perunovich, whom he has since married and who is the mother of his two children. Perunovich was receiving AFDC from Anoka County on the Absent Parent program. Perunovich reported on her initial application and monthly reports that Thompson was not living in the home. She reported that Thompson was visiting the children four times a week for a couple of hours per visit.

A search warrant for Perunovich's house was executed the morning of December 9, 1986. Thompson was present in the home and both Thompson and Perunovich were arrested and taken to the county jail. A search was then conducted resulting in the seizure of numerous items belonging to Thompson or indicating his residence in the house.

Following her arrest, Debbie Perunovich agreed to talk to a welfare fraud investigator from Anoka County. Perunovich admitted Thompson was living in the home for at least the last nine months, identified reporting forms she had submitted to Anoka County authorities, and stated "she was going to call her welfare worker tomorrow and ask that her case be closed effective January 1st." She said she and Thompson were going to "make a fresh start," with Perunovich getting a job so they could make it without welfare assistance. She then admitted that both she and Thompson knew it was wrong for her to be receiving assistance, and that it bothered them. When asked if Thompson knew it was against the law, she replied, "yes he knew."

Perunovich agreed to give a taped statement. In this statement, Perunovich summarized her conversation(s) with Thompson about the welfare situation:

Did you and Earl ever discuss the welfare situation?

Yes.

What did you talk about?

Well, we talked about that I was doing wrong and I knew this, but like I said, I was trying to have my son, make sure he was all right first and then I was going to go in and get a job and just get done. So you realize that by not reporting that Earl was living with you was against the law?

Yes.

Did Earl realize that too?

Yes.

Perunovich later married Thompson and Thompson sought to suppress her statement claiming the marital privilege would prevent it from being admitted in his trial. Minn.Stat. § 595.02(1). He also contended the statement was inadmissible hearsay and would violate his right to confrontation.

The trial court granted the motion to suppress, concluding the marital privilege would apply to Perunovich's statement.

## ISSUE

Did the court clearly err in suppressing the statement?

## DISCUSSION

The trial court adopted the reasoning of the South Dakota Supreme Court in *State v. Jaques,* 256 N.W.2d 559 (S.D.1977), in which the state's principal witness married the defendant following a preliminary hearing at which she had testified. In *Jaques,* the prosecution sought to introduce the hearing testimony as an exception to the hearsay rule. *Id.* at 562. The court, however, while noting the testimony did qualify as an exception to the hearsay rule, stated that the pretrial testimony was subject to the same competency objection as would be the (now) spouse's trial testimony. *Id.* at 563; *but see State v. Dikstaal,* 320 N.W.2d 164, 165–66 (S.D.1982) (*Jaques* ruling superceded by statute eliminating incompetency doctrine's applicability to privilege for marital communications).

■ Our statute, similar to that in effect in *Jaques,* provides in relevant part:

A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during

the marriage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during the marriage.

Minn.Stat. § 595.02, subd. 1(a) (1986). The marital privilege statute is twofold, providing for both the incompetency of the spouse and the privilege for marital communications. Thompson and Perunovich were not married at the time of their alleged communication regarding the "welfare situation"; therefore, that part of the statute protecting marital communications does not apply.

In *State v. Shifsky*, 243 Minn. 533, 69 N.W.2d 89 (1955), a prosecution for assaulting a police officer, the supreme court held admissible a declaration defendant's wife made to a police officer that defendant was threatening to shoot her. The court noted

> that Mrs. Schifsky did not testify against her husband as she was not a witness at the trial as has been defined by statute but the testimony admitted was that of third-party witnesses, not of Mrs. Schifsky.

*Id.* at 540, 69 N.W.2d at 94. The court, after considering objections to the admissibility of the statement on grounds of marital privilege, spousal incompetency and hearsay, stated:

> We hold that this evidence was admissible for the purpose stated for the reason that the statute relates only to testimony under oath by the spouse as a witness in a judicial proceeding.

*Id.*

The state contends the statement to police is not excluded by the rule of spousal incompetency because the Perunovich statement was not testimony given in a judicial proceeding. Thompson cites *National German-American Bank v. Lawrence*, 77 Minn. 282, 79 N.W. 1016, *on rehearing*, 77 Minn. 282, 287, 80 N.W. 363 (1899), in which the supreme court initially excluded a spouse's testimony stating:

> The law is that the declarations of husband and wife are subject to the same rules of exclusion which govern their testimony as witnesses.

*Id.* at 286, 79 N.W. at 1017. In *Lawrence*, however, the spouse's statements were not merely declarations but testimony given in proceedings supplementary to execution. Moreover, upon rehearing, the court disallowed the exclusion because the defendant consented to permit his spouse to testify. *Id.* at 289–90, 80 N.W. at 364.

We decline to address this issue in the abstract. The use of an out-of-court statement by a spouse, who concededly will not testify at trial, inevitably raises hearsay problems, and, in a criminal case, an issue regarding the defendant's right to confrontation. While the trial court did not expressly address these issues in its order, the parties argue them on appeal, and we are unable to extricate them from the issue of marital privilege. *See Schifsky*, 243 Minn. at 539–40, 69 N.W.2d at 94 (discussing both hearsay and marital privilege issues); *see also* Minn.R.Crim.P. 11.04 (court at the omnibus hearing shall determine any evidentiary issues that can be disposed of before trial).

■ The state contends the Perunovich statement is admissible as a statement against interest. Minn.R.Evid. 804(b)(3). The state argues Perunovich was admitting her own, as well as Thompson's, culpability by revealing their discussions.

In a welfare fraud case, the state must prove the recipient knew she was not entitled to the assistance she was receiving, and that she made false representations in order to obtain the assistance. *State v. Ibarra*, 355 N.W.2d 125, 129 (Minn.1984). The reporting forms signed by Perunovich establish the false representations. The application and redetermination form expressly warn that providing false information could be prosecuted as fraud. The forms do not expressly state eligibility is dependent on the other parent's absence from the home. Perunovich, however, as the actual recipient, had gone through the intake process, read and completed the applications and monthly reports. It is a far different matter to prove she had the requisite knowledge of illegality than to prove Thompson did. *See State v. Stoffel*, 392 N.W.2d 547, 548 (Minn.1986) (father who

lived in the home was not shown to have known his presence made the family ineligible for benefits).

Thus, the state could have proved Perunovich's guilt largely by the representations on her welfare reporting forms. Her statement that she and Thompson had discussed the illegality of their receiving assistance inculpated Thompson far more than it did her. From Perunovich's viewpoint it was scarcely inculpatory at all, since she had been discovered in a clear misrepresentation, and as a layperson likely knew little of the knowledge or intent element of welfare fraud.

Significantly, Perunovich's statement concerning her discussions with Thompson was offered as part of her attempt to mitigate the offense by stating she was about to get a job and go off welfare. *See State v. Hansen,* 312 N.W.2d 96, 101 (Minn.1981) (hearsay statements primarily exculpatory are suspect absent "solidly inculpating statements"). She may have felt this claim, clearly in her best interest, was not credible without some admission of knowledge of wrongdoing. *Cf. State v. Black,* 291 N.W.2d 208, 213 (Minn.1980) (witness' statement deeply involving her in planning of crime was against interest despite denial of knowledge of crime to be committed).

█ The Perunovich statement is not properly admissible as a statement against interest. Nor does the statement have the "equivalent circumstantial guarantees of trustworthiness" required for admission under the "catchall" exception. Minn.R. Evid. 804(b)(5); *see Hansen,* 312 N.W.2d at 103 (unsworn statements made under police questioning traditionally considered untrustworthy).

█ Admission of the Perunovich statement would violate the confrontation clause absent a waiver of the right to confrontation. *See id.* (unsworn statements to police made by unavailable declarants violated right to confrontation). The state, however, contends Thompson's marriage to Perunovich, by preventing her testimony, constitutes a waiver. *See e.g. Black,* 291 N.W.2d at 214 (defendant waives right of confrontation by any wrongdoing causing witness' unavailability at trial). We believe, however, that marriage cannot be construed as "wrongdoing." Thompson, the father of Perunovich's children, did not clearly marry her solely to preclude her from testifying. Courts are reluctant to imply a waiver of the right to confrontation. *See Hansen,* 312 N.W.2d at 105 (waiver not implied from witnesses' reluctance to testify absent threats by defendant); *see also Olson v. Green,* 668 F.2d 421, 429 (8th Cir.), *cert. denied,* 456 U.S. 1009, 102 S.Ct. 2303, 73 L.Ed.2d 1305 (1982) (conduct of another accused in threatening witness did not waive defendant's right to confrontation).

On a pretrial appeal, the state must show the trial court's ruling is clearly erroneous and the suppression of the statement "significantly reduces the likelihood of a successful prosecution." *State v. Joon Kyu Kim,* 398 N.W.2d 544, 551 (Minn.1987). The state has not shown suppression of the Perunovich statement was clearly erroneous. We conclude the statement was not within any exception to the hearsay rule. Therefore, we need not determine whether hearsay declarations, which by definition are offered to prove the truth of the matter asserted in them, Minn.R.Evid. 801(c), are so testimonial in nature as to be covered by the rule of spousal incompetency.

## DECISION

The trial court did not clearly err in suppressing the statement.

Affirmed.