**STATE of Minnesota, Respondent,**

v.

**Derrick Ramon DUKES, Appellant.**

**No. C1–95–125.**

Supreme Court of Minnesota.

Feb. 16, 1996.

14

Evan W. Jones, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Susan Gaertner, Ramsey County Atty., Darrell C. Hill, Asst. Ramsey County Atty., St. Paul, for respondent.

## OPINION

STRINGER, Justice.

Following a jury trial in Ramsey County District Court, appellant Derrick Ramon Dukes was convicted of first-degree felony murder of Joe McKinney and attempted first-degree felony murder and attempted aggravated robbery of Bennie Chaney. Appellant was sentenced to consecutive terms of life and 180 months' imprisonment. He appeals the convictions and the sentences, challenging the following four rulings of the trial court:

1. admission of the withdrawn guilty plea of appellant's accomplice, Kevin Lewis;
2. refusal to instruct the jury on the lesser-included offense of second-degree felony murder;
3. refusal to sever the offenses into two separate trials; and
4. imposition of consecutive sentences.

Appellant also challenges the sufficiency of the evidence to sustain the guilty verdicts. We affirm.

On April 1, 1994, two shooting incidents occurred near Marshall Avenue and Iglehart Boulevard in St. Paul, in a one-block vicinity and within 15 minutes of each other. The incidents began when appellant drove his Pontiac automobile from Minneapolis to St. Paul with his accomplices Steve Morrison and Kevin Lewis, appellant and Morrison armed with handguns. They arrived in St. Paul with Morrison and Lewis in the rear passenger and front passenger seats respectively. How the events transpired is not entirely clear, but from the testimony of various witnesses it appears that the trio initially traveled south on North St. Albans where they encountered Bennie Chaney walking southeast through People's Park at the corner of Iglehart and St. Albans. Appellant drove his car alongside the curb next to Chaney, and Lewis held a gun up to Chaney, cocked it, and made a statement that to Chaney meant "give me your money." Chaney ran toward the back of the car and down Iglehart about 30 yards. When he turned around, he saw that the car was still standing in the same spot, and he reached into his coat to act as if he had a gun. At that point, one of the car's rear doors opened and Morrison leaned out, shouted something, and fired two gunshots at Chaney. Fortunately, Chaney escaped unharmed and at trial identified appellant as one of the men he saw in the Pontiac on April 1.[1]

A nearby resident happened to be washing his car at the time the shooting at Chaney took place. He testified that he heard loud cracks of gunfire in the street, looked in the direction of St. Albans and Iglehart, and saw a car stopped. He further testified that there were at least two people in the car and that he saw someone's hand protruding from the driver's side of the car holding a smoking gun. Shortly after the shots were fired, the car traveled past the witness, and he made a mental note of the license plate number—171–HHK. He then went inside his house, wrote the number down, and immediately reported the incident to 911.

The Pontiac proceeded south on St. Albans one block, turned right on Marshall Avenue, and turned right again on North Grotto Street. It came to a stop on Grotto between Iglehart and Marshall, where Morrison and Lewis got out of the car and approached a car occupied by Joe McKinney which was also stopped on Grotto facing north. While Morrison stood at the driver's window and

---

1. Chaney initially gave the police a description that did not match appellant.

demanded money from McKinney, Lewis, armed with the gun appellant had brought, crouched down on the passenger's side. McKinney moved his hand and both Morrison and Lewis shot at him. One of Lewis's shots hit McKinney in the back of the head and McKinney died early the next morning from the gunshot wound.

Officer Robert Weston from the St. Paul Homicide Unit canvassed the neighborhood where the shootings occurred, asking people if they had seen or heard anything, and he obtained from an unnamed witness the license plate number of the car involved. When police officers went to the home of the woman to whom the license number was registered, she told them that she had recently sold the vehicle to a person named Shadow, who she believed worked as a bouncer at Gatsby's Bar in St. Paul. A police investigative unit went to Gatsby's and located a car in the parking lot bearing the license plate number 171–HHK, the same number that the witness reported to 911 and the same number that Officer Weston obtained during his canvass. Appellant was identified at Gatsby's as the owner of the car and was arrested.

Officer Craig Bailey testified that sometime after appellant's arrest he responded to a telephone request from Renae Montpetit, the manager of Gatsby's Bar, to retrieve from the bar a jacket that she said appellant had left there. Inside the jacket pocket Bailey found a .32 caliber pistol. At trial appellant's girlfriend, Linda Fleischman, was unable to positively identify the jacket as appellant's, but she testified that he had a jacket like it. Officer James Gag, a St. Paul police firearms examiner, testified that based on comparison tests the bullet found by the medical examiner in Joe McKinney's body was fired from the weapon found in the jacket pocket and that a casing found on Grotto Street was also from the same .32 caliber weapon. Officer David Mathison testified that when he examined the black Pontiac 6000, license plate number 171–HHK, he found appellant's driver's license tucked under the vanity mirror on the driver's side of the car.

A search of appellant's home yielded several items of clothing, including a black hooded sweatshirt and a pair of brown cloth work gloves that fit the description given by off-duty Officer James Blakey of items worn by the driver of the black Pontiac traveling north on Grotto immediately following the firing of several gunshots. Blakey testified that he was at his home at 295 North Grotto at the time.

Susan Laaker–Rude, a chiropractic assistant, testified that appellant showed up for an 11:45 a.m. appointment on April 1 and that he came in with a man named Kevin. She and her husband rented half of their duplex to appellant, and she testified that when they were at home that afternoon, they saw appellant come home at about 2:20 p.m. with two other men—one she identified as Kevin and the other was introduced as Steve.

Four children who witnessed the McKinney shooting also testified at trial. They were riding their bikes and came upon McKinney in his car on Grotto Street. One of them was standing next to the driver's window in the process of asking McKinney for money when he saw another man approach the car. They saw the man point a gun at McKinney, demand money from him, and begin shooting. J.C. (age 10) gave a description of the assailant, recalling that the person was wearing all black clothing and a ski mask.

Several months before appellant's trial, Kevin Lewis admitted involvement in both shooting incidents and pled guilty to second-degree murder of Joe McKinney and attempted first-degree murder of Bennie Chaney. At the plea hearing, Lewis testified that before he came to St. Paul on the day of the shootings, he was with Steve Morrison and appellant at appellant's home in Minneapolis. The three then drove to St. Paul in appellant's Pontiac 6000. At the time, appellant carried a .32 caliber pistol and Morrison carried a .38 caliber pistol. Lewis testified that the men were on their way to St. Paul for the purpose of robbing somebody, and that as they approached Bennie Chaney, appellant drove the car, Lewis was in the front passenger seat, and Morrison was in the back seat. As they approached Chaney, at

Lewis's request appellant slowed down and then stopped next to Chaney. With his window open and appellant's .32 caliber pistol in hand, Lewis put the gun up to the open window and pulled the slide back. He testified that he said nothing to Chaney, that Chaney ran to the back of the car, and as Chaney ran down the street away from the car, Morrison leaned out and shot at him twice. Appellant then drove the car away. Lewis testified that he understood that when Morrison shot at Chaney, he could have killed him, and that Lewis, Morrison, and appellant were all acting together at the time.

Lewis further testified that they drove south on the same street, made two turns, and stopped briefly when Morrison jumped out of the car. Lewis saw Joe McKinney's car stopped on Grotto and saw a child standing next to the driver's window. When he saw Morrison approach McKinney's car with his gun, he assumed that Morrison planned to try to rob McKinney. Lewis testified that he told appellant to drive straight ahead, but appellant drove in front of McKinney's car and stopped. Lewis then got out of the car armed with appellant's .32 caliber pistol and knelt down on the passenger's side of McKinney's car while Morrison stood at the driver's side. Although Lewis could not see what was happening, he believed that Morrison was trying to rob McKinney. Lewis then looked into the car, saw McKinney move his hand, and heard Morrison shooting. Lewis testified that he fired his weapon intending to scare McKinney, but that McKinney moved into the bullet. Lewis again acknowledged that the three men had driven to St. Paul to rob somebody, and that by shooting in McKinney's direction, he knew that he might kill him. He also testified, however, that he shot in McKinney's direction only to scare him, not to hit him.

After he shot McKinney, so Lewis testified, he got back into the car where appellant was waiting; Morrison continued shooting at McKinney's car as it rolled across the parking lot at Grotto and Iglehart, and then he too climbed back into appellant's car and the trio drove off. Appellant dropped Morrison off at his house, proceeded with Lewis to

Lewis's grandmother's house, and then went on to appellant's own house. Both Morrison and Lewis gave appellant the pistols they had used in the shootings, and appellant cleaned and stored them in his bedroom. Later that evening appellant returned Morrison's gun to him.

At Lewis's plea hearing, the state offered to dismiss the aggravated robbery charge and reduce the McKinney first-degree murder charge if Lewis would plead to second-degree murder of McKinney and attempted first-degree murder of Chaney, as well as testify at the trials of appellant and Morrison. Lewis agreed and entered guilty pleas to second-degree and attempted first-degree murder. On September 13, however, at the beginning of appellant's trial, Lewis refused to testify and withdrew his guilty pleas. The court granted the state's motion to admit into evidence a redacted version of Lewis's plea transcript, including Lewis's plea bargain and the fact that he had withdrawn the plea and would stand trial.

The jury also heard Ramsey County Probation Officer Kevin McConnon's presentence investigation report on Lewis, noting that Lewis said that he and appellant did not intend to rob McKinney—it was Morrison alone who decided to do so. McConnon's report also reflected that Lewis indicated that he and Morrison agreed to help appellant obtain money by committing a robbery.

At a pre-trial hearing, the court denied appellant's motion to sever the Chaney and McKinney offenses into separate trials, concluding that the relationship between the two offenses indicated that they arose from a single behavioral incident and were motivated by the same criminal objective. Moreover, the court was persuaded that joinder would not prejudice appellant in the presentation of his defense. At the close of the evidence, the court also refused appellant's motion to submit an instruction on second-degree felony murder. The jury found appellant guilty of all three offenses, and the court imposed consecutive sentences of life imprisonment for first-degree murder and 180 months for attempted first-degree murder. The court did not impose a sentence on

the attempted aggravated robbery conviction.

■ We begin our review with appellant's claim that the Lewis plea transcript should not have been admitted in evidence. Appellant first cites Rule 15.06 of the Minnesota Rules of Criminal Procedure which provides: "If the defendant enters a plea of guilty which is not accepted or which is withdrawn, neither the plea discussions, nor the plea agreement, nor the plea shall be received in evidence against or in favor of the defendant in any criminal, civil, or administrative proceeding." While acknowledging that the rule, by its language, does not apply to the situation here, appellant argues that the rule expresses a policy that bars the admission of Lewis's withdrawn guilty plea against appellant. We disagree. Rule 15.06 addresses the circumstance where the defendant is the declarant, thus raising issues of the Fifth Amendment privilege against self-incrimination—a situation very different from that at hand; nor does Rule 15.06 express any kind of policy that could be a helpful guide. It and Minnesota Rule of Evidence 410[2] are simply irrelevant to a situation, as here, where the testimony was not offered in favor of or against the declarant.

Appellant also cites *State v. Cermak*, 365 N.W.2d 243, 247 (Minn.1985), for the proposition that "generally evidence of a plea of guilty * * * is not admissible to prove the guilt or lack of guilt of the accused." *See also State v. Helenbolt*, 334 N.W.2d 400, 406–07 (Minn.1983) (suggesting that the criminal complaint of an accomplice might be inadmissible hearsay that deprives the defendant of the right to cross-examine). But *Cermak* does not express an absolute bar to admission and indeed the *Cermak* court held the plea and convictions were admissible. *Id.* at

247. The distinguishing feature from *Cermak*, however, is that Lewis's account of events leading up to and after the crime was not offered to establish Lewis's guilt, as was the case in *Cermak*, but rather for the value of the first-hand narrative of what happened. Therefore, we conclude that the plea admission was not barred by the rules of criminal procedure, rules of evidence, or *Cermak*.

■ Next, appellant argues that reading the transcript of the guilty plea violated the evidentiary rule prohibiting the admission of hearsay testimony. The trial court admitted Lewis's plea transcript in evidence under Minnesota Rule of Evidence 804(b)(3)—the statement against interest exception to the rule against hearsay—and also cited *Williamson v. United States*, 512 U.S. ——, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) in support of its ruling. Minnesota Rule of Evidence 804(b)(3) provides:

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.[3]

In *Williamson*, a divided United States Supreme Court determined that Federal Rule of Evidence 804(b)(3), to which the

---

**2.** Minnesota Rule of Evidence 410 prohibits admission of:

a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime or of statements made in connection with any of the foregoing pleas or offers * * * in any civil, criminal, or administrative action, case, or proceeding *whether offered for or against the person who made the plea or offer.*

**3.** The unavailability test was met when Lewis stated that he would not testify and of course he could not be forced to testify because of his Fifth Amendment privilege against self-incrimination. Minn.R.Evid. 804(a)(2) (defining "unavailability" to include witness's refusal to testify concerning the subject matter of the out of court statement despite a court order to do so); *see also State v. Anderson*, 284 N.W.2d 360, 361 (Minn.1979).

(emphasis added).

Minnesota rule is an identical counterpart, does not allow the admission of non-self-inculpatory statements even in the broader context of a generally self-inculpatory narrative. 512 U.S. at ——, 114 S.Ct. at 2435. In *Williamson*, the statement of the defendant's accomplice given to the police was admitted in evidence in the defendant's trial for cocaine possession with intent to distribute. *Id.* at ——, 114 S.Ct. at 2434. In the statement the accomplice admitted involvement in illegal drug distribution—an inculpatory statement—but also stated that he was working for the defendant, who had significantly more responsibility—an exculpatory statement. *Id.* at ——, 114 S.Ct. at 2434.

■ The first issue before the *Williamson* court was what was the "statement" embraced by Rule 804(b)(3). The Supreme Court defined "statement" narrowly to mean only the inculpatory statements of the accomplice. *Id.* at ——, 114 S.Ct. at 2435. We agree that this is an appropriate analysis. *See State v. Ford*, 539 N.W.2d 214, 227 (Minn.1995). A broader definition of "statement" that includes exculpatory statements of the accomplice could significantly undermine the assumption that the statement is truthful because it is against the declarant's interest. The trial court here appropriately followed *Williamson*, concluding that the redacted version of the plea transcript was wholly self-inculpatory. In *Williamson*, as the "small fish in a big conspiracy," the accomplice apparently attempted to reduce his exposure to criminal liability by implicating someone more responsible—to wit, the defendant. *Williamson*, 512 U.S. at —— – ——, 114 S.Ct. at 2437–38. Here the case for admissibility is even more compelling because, although Lewis's testimony did implicate appellant, it did not "project[ ] an image of a person acting not against his penal interest, but striving mightily to shift principal responsibility to someone else." *Id.* at —— – ——, 114 S.Ct. at 2439–40 (Ginsburg, J., concurring in part and concurring in the judgment). Further, the declarant in *Williamson* had given the police an initial account that was completely at odds with his later statement, thus putting at issue the reliability of the proffered testimony. Lewis was facing 20 years in prison as a result of his plea, his statement was taken in a court proceeding under oath where he was represented by counsel, and his story was entirely consistent with other admissible evidence. We conclude that under *Williamson* the redacted Lewis statement was properly admitted against a hearsay challenge because its inculpatory nature gave it a high level of trustworthiness.

■ Appellant also claims that admitting the guilty plea violated his constitutional rights under the Confrontation Clause. The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." The right of confrontation is fundamental under both the federal and state constitutions, and the analysis is the same under both. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965); *State v. Black*, 291 N.W.2d 208, 213 (Minn.1980). For a hearsay statement to be admissible without violating an accused's right to confront those who testify against the accused, it must be necessary and reliable. *Ohio v. Roberts*, 448 U.S. 56, 65, 66, 100 S.Ct. 2531, 2538, 2539, 65 L.Ed.2d 597 (1980). We conclude that Lewis's refusal to testify in court made the hearsay necessary because his Fifth Amendment rights would bar his being forced to testify. The second element—reliability—exists if the hearsay statement falls under a "firmly rooted" exception to the hearsay rule. *Id.* at 66, 100 S.Ct. at 2539. In *Williamson*, the Supreme Court reserved the question whether the exception for statements against interest is "firmly rooted" for Confrontation Clause purposes, but noted that "the very fact that a statement is genuinely self-inculpatory * * * is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." 512 U.S. at ——, 114 S.Ct. at 2437. For the reasons discussed above relating to the admission of Lewis's plea under the hearsay exception, we conclude that the Lewis plea contained sufficient indicia of reliability to avoid violating the Confrontation Clause.

■ Appellant next claims that the trial court erred in refusing to instruct the jury on the lesser-included offense of second-degree felony murder. This determination is within the sound discretion of the trial court, but the lesser-included offense instruction must be given if the evidence provides a rational basis for an acquittal on the charged offense and a conviction on the lesser offense. *State v. Leinweber*, 303 Minn. 414, 421–22, 228 N.W.2d 120, 125–26 (1975); *see* Minn.Stat. §§ 609.185, 609.19 (1994). Appellant claims that the crime of unintentional killing should have been submitted because Lewis did not intend to kill McKinney—the presence of intent being the only distinguishing factor between first- and second-degree felony murder charges—nor did Lewis even participate in the predicate robbery. We believe the evidence of intent was strong enough that the jury could not rationally have acquitted appellant on the first-degree charge, where appellant and his accomplices planned the robbery, armed themselves with loaded handguns, proceeded to St. Paul for the express purpose of executing their plan, located two victims, and finally, in the course of their robbery spree, shot McKinney in the back of the head at close range. In light of this evidence, we conclude that the trial court did not abuse its discretion in denying the lesser offense submission.

■ The third assigned error is the denial of appellant's motion to sever the Chaney offense from the McKinney offense. Appellant argues that Minn.R.Crim.P. 17.03 requires severance because the issues relating to intent are different for each crime and this makes them separate incidents. In determining whether there should be separate trials for separate charges, we look to how the offenses were related in time and geographic proximity and at whether the actor was motivated by a single criminal objective. *State v. White*, 292 N.W.2d 16, 18 (Minn. 1980); *State v. Knight*, 260 N.W.2d 186, 187 (Minn.1977) (per curiam). Here, where the time between the two crimes was a matter of only a few minutes, the proximity was within one block, and each crime was motivated by the objective of obtaining money through robbery, the trial court did not abuse its discretion in refusing to sever the trials.

■ The fourth claim of error is that the consecutive sentences unfairly exaggerated appellant's culpability, claiming that appellant's participation in the crimes was passive. Because of the multiple victims of these crimes, appellant was given a mandatory life sentence for first-degree murder pursuant to Minn.Stat. § 609.185 (1994) and a consecutive 180 months for attempted first-degree murder, as prescribed by the Minnesota Sentencing Guidelines. Appellant's claim of minimal involvement simply does not hold up against a record of plans being made at his home, the use of his car, his furnishing at least one of the weapons used, and his chauffeuring Lewis and Morrison as they pursued their shooting rampage. After the failed Chaney robbery, the three perpetrators next turned to McKinney, where Lewis and Morrison positioned themselves on each side of McKinney's car, firing at the innocent victim while appellant waited in the driver's seat of his car. Following the killing, appellant transported them back to Minneapolis and cleaned and stored both weapons. This is hardly a passive participation worthy of a claim of exaggerated culpability. We hold that the trial court's imposition of consecutive sentences was not an abuse of discretion.

■ Finally, appellant raises the issue of whether the state's proof at trial met the reasonable doubt standard. As discussed above relating to appellant's other claims, the evidence supporting the verdict is substantial. We reject the claim that the reasonable doubt standard was not met and we affirm the convictions and sentences.

Affirmed.