STATE of Minnesota, Respondent,

v.

Angel MORALES, Appellant.

No. A07–2401.

Court of Appeals of Minnesota.

April 28, 2009.

Lori Swanson, Attorney General, St. Paul, MN and Michael O. Freeman, Hennepin County Attorney, David C. Brown, Assistant County Attorney, Minneapolis, MN, for respondent.

Benjamin J. Butler, Assistant State Public Defender, St. Paul, MN, for appellant.

Considered and decided by TOUSSAINT, Chief Judge; SCHELLHAS, Judge; and RANDALL, Judge.

## OPINION

RANDALL, Judge.*

This appeal is from a conviction for second-degree felony murder (unintentional death in the course of an aggravated robbery) in violation of Minn.Stat. § 609.185(a)(3) (2004). Appellant challenges the trial court's admission of hearsay statements and *Spreigl* evidence, and the court's decision to allow the state to call a witness expected to invoke his Fifth Amendment privilege and to question him by using his testimony in his own trial. We conclude that reversible error occurred both in the admission of hearsay and in the

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

questioning of a witness asserting the Fifth Amendment privilege. We reverse and remand.

## FACTS

The state alleged that appellant Angel Morales, Felipe Vega–Lara, and Tarun Solorzano–O'Brien entered a south Minneapolis house of prostitution on March 13, 2006, with the intent to rob the operators of the house, and that Vega–Lara shot the victim, V.M.-O. The state alleged that at the house, Vega–Lara and Solorzano–O'Brien paid the victim for the services of two prostitutes, C.M. and M.R. The state alleged that later, Vega–Lara and Morales confronted the victim, who resisted their attempts to rob him, and was killed.

Vega–Lara's fingerprints were lifted from a glass in the kitchen of the house. C.M. identified Vega–Lara's photograph as that of her customer. M.F., who cooked meals at the house, also identified Vega–Lara from a photograph. The police then began investigating Vega–Lara's associates, one of whom was Morales. One of Vega–Lara's associates, M.G., gave police the name of Morales, who he said had told him three days before the murder of the plan to rob a house of prostitution. M.G. also told police that he talked to Vega–Lara after the murder, and Vega–Lara told him that Morales had drawn a gun on the victim, and Vega–Lara had then shot the victim.

The defense moved before trial to exclude M.G.'s proposed testimony regarding the statements made by Vega–Lara, and M.G.'s statement that he had seen Morales with a gun in the past, as well as any references to the gang to which Vega–Lara and the others belonged. The prosecutor agreed that M.G.'s testimony about what Vega–Lara said to him about Morales's involvement in the crime should not be admitted. These hearsay statements were ultimately redacted at trial to refer to Morales only as "another individual."

The trial court ruled the testimony about Morales's possession of a gun admissible, expressing the opinion that it did not constitute *Spreigl* "bad acts" evidence. The state, however, gave notice of its intent to present *Spreigl* evidence of a March 2005 attempted aggravated robbery, for which Morales had been adjudicated delinquent. The prosecutor agreed not to present evidence concerning Morales's alleged gang involvement because it was not necessary to explain the *Spreigl* offense.

The state's theory was that either Vega–Lara or Morales, or both, had "cased" the house for a possible robbery, discovering how cash was handled by the victim and learning that there was a gun kept at the house that they could also steal. The testimony at trial showed that the three men appeared on March 13, and Vega–Lara paid for himself and Solorzano–O'Brien to have sex with the prostitutes, while a third man (allegedly Morales) sat on a couch in the living room. Vega–Lara then emerged from his session with C.M., and the state's theory was that he and Morales tried to rob the victim. During this scuffle, Vega–Lara shot the victim, after Morales had allegedly also drawn a gun. The victim died of a single gunshot wound.

Both C.M. and M.R. testified that Vega–Lara, who was C.M.'s customer, was very nervous and "hyper." C.M. testified that Vega–Lara was upset with the brevity of their encounter and wanted another chance, which she told him he would have to pay for. He then left the bedroom and went out into the living room. C.M. could see that the third man was still in the living room. She then closed the bedroom door and soon heard the noises of people apparently struggling, then the sound of a gunshot. M.R. testified that she also

heard noises, which she described similarly, including the sound of a gunshot.

The state attempted to secure Vega–Lara's testimony, requesting that the court grant him use immunity, which it did. At trial, Vega–Lara's attorney stated that his client would assert his Fifth Amendment privilege, despite the grant of use immunity, because the immunity would not preclude a prosecution for perjury.

When it came time for Vega–Lara's testimony, his attorney was no longer present, but, outside the presence of the jury, Vega–Lara indicated he would refuse to answer questions. The prosecutor argued that she was entitled to call Vega–Lara and make him refuse to answer on the stand each question posed to him. Defense counsel objected to this process, but the court indicated that Vega–Lara had no privilege to refuse to answer, given the grant of use immunity.

Vega–Lara took the stand, and the court explained to the jury that Vega–Lara had testified in his own trial and had been granted use immunity for testifying in Morales's trial. Vega–Lara refused to answer the prosecutor's first question, which was whether he knew Morales. Although Vega–Lara refused to say whether he had testified in his own trial, the prosecutor began asking Vega–Lara questions about that testimony, showing him a transcript to refer to his prior testimony. The prosecutor quoted much of this testimony in questioning Vega–Lara. The prosecutor intentionally developed a narrative of Vega–Lara's trial testimony by means of these questions, all of which Vega–Lara refused to answer. Vega–Lara also refused to answer defense counsel's questions, except he admitted that he had testified in his own trial to having had no intent to kill the victim.

At the end of the state's case, the court ruled that the *Spreigl* evidence of Morales's participation in an aggravated robbery on March 9, 2005, was admissible. The parties agreed that the *Spreigl* offense would be presented by reading to the jury the juvenile-delinquency petition, including the probable-cause portion, and a stipulation that Morales was "found guilty" of attempted first-degree aggravated robbery.

In her closing argument, the prosecutor, relying on M.G.'s testimony, argued that it was Morales who planned the robbery: "[M.G.] told you that the defendant's plan was to rob a whorehouse on Cedar Avenue for money and a gun. Defendant cased it and found out that there were two women there and two men there and it cost forty dollars per person for sex." In arguing that Morales was physically present during the crime, the prosecutor relied on physical descriptions given by the witnesses as well as the fact that Morales was a close associate of Vega–Lara and Solorzano–O'Brien. The prosecutor also pointed to Vega–Lara's statement as inculpating Morales, despite the fact that it had been redacted to refer to "another person": "[M.G.] told you that when Felipe Vega–Lara left the bedroom he saw the defendant walking towards his target with his gun drawn." Defense counsel's objection to this statement was sustained. *Id.* But the court overruled subsequent defense objections to other references to "the defendant" instead of "another person," despite the pretrial agreement to use "person" or "individual" instead of a reference to Morales.

The trial court instructed the jury that Vega–Lara was an accomplice to the crime alleged and gave an accomplice-corroboration instruction. The court also instructed the jury that Vega–Lara's out-of-court statement was admitted only as it related to Vega–Lara's "testimony at this trial"

and was not to be considered "as evidence of the facts referred to in the statement."

The jury found Morales not guilty of first-degree murder, second-degree felony murder (while committing an assault), and second-degree intentional murder. The jury found Morales guilty of second-degree felony murder (while committing aggravated robbery or attempted aggravated robbery). Morales was sentenced to 150 months. This appeal follows.

### ISSUES

1. Did the trial court abuse its discretion in admitting the accomplice Vega–Lara's hearsay statements of the involvement of "another person" in the crime?

2. Did the trial court err in allowing the state to call Vega–Lara as a witness knowing that he would assert his Fifth Amendment privilege despite a grant of use immunity?

3. Did the court abuse its discretion in admitting as *Spreigl* evidence appellant's juvenile offense of aggravated robbery?

### ANALYSIS

1. Redacted hearsay statements

■ Morales argues that the trial court abused its discretion in admitting the hearsay statements of Vega–Lara, made to M.G., concerning the involvement of "another person" in planning and executing the crime. Vega–Lara's statements had actually named Morales, but the name was redacted to attempt to eliminate the prejudice from the statements, which were not against Vega–Lara's penal interest and could, if not redacted, unfairly prejudice Morales. *See generally State v. Dukes,* 544 N.W.2d 13, 18–19 (Minn.1996) (apply-ing U.S. Supreme Court decision holding that non-self-inculpatory portions of broader self-inculpatory statement are inadmissible as statements against interest).

■ Evidentiary rulings are within the trial court's discretion and will not be reversed absent a clear abuse of discretion. *State v. Glaze,* 452 N.W.2d 655, 660 (Minn. 1990). The trial court ruled that Vega–Lara's statements to M.G. after the robbery/murder were admissible as statements against interest. *See* Minn. R. Evid. 804(b)(3) (hearsay exception when declarant is unavailable). The prosecutor argued this exception prospectively on the assumption that Vega–Lara would assert a Fifth Amendment privilege and be "unavailable" to testify. The trial court ruled that Vega–Lara's statement to M.G. that he shot the victim would be admissible as a statement against penal interest if Vega–Lara proved to be "unavailable."[1] Vega–Lara also told M.G. of Morales's participation in the robbery/murder, statements that were not self-inculpatory. But the statements identifying Morales were later redacted, when M.G. testified, to refer to Morales only as "another person."

Morales argues that the redaction was ineffective, and that the term "another person" was, under the circumstances, a patent reference to Morales that the jury was unlikely to have missed. We agree. The state's closing argument only made it worse.

M.G.'s testimony about what Vega–Lara told him came immediately after M.G. had testified that Morales had told him of a plan to rob the house and of the visit of someone to "case" the house for the robbery. The jury could hardly have failed to

---

1. A witness who refuses to testify based on a Fifth Amendment privilege is generally "unavailable." *See Dukes,* 544 N.W.2d at 18 n. 3. We need not address that issue, however, as Morales does not claim that the self-inculpatory portions of Morales's statements were inadmissible.

realize that "another person" referred to Morales when the prosecutor shifted to questioning M.G. about what Vega–Lara, not Morales, had told him.

Further, the prosecutor herself in closing argument drew the connection between the "another person" reference and Morales, in a *plain violation* of the redaction. In the prosecutor's argument, she described Vega–Lara's statements to M.G. as implicating "the defendant," not "another person," as the redaction had left it. The prosecutor made five references to Vega–Lara's implicating "the defendant," only one of which the court sustained an objection to and told the jury to disregard. These references completely undermined the reason for the redaction of Morales's name from the hearsay statements and deprived it of any effect.

Thus, the state was allowed, in effect, to elicit the hearsay statements of Vega–Lara that Morales had a gun on the day of the robbery, walked towards the victim with his gun drawn, and got into a struggle with the victim over that gun. These statements were not, on balance, against Vega–Lara's penal interest; rather, they tended to minimize his own culpability in the offense. As Morales points out, there was other evidence supporting an inference that Vega–Lara, who was visibly nervous from the beginning, killed the victim on his own after a disagreement over whether he would have to pay for a second sexual encounter with the prostitute.

An error in admitting evidence is not harmless if there is a reasonable possibility that the wrongfully admitted evidence significantly affected the jury's verdict. *See State v. Post,* 512 N.W.2d 99, 102 n. 2 (Minn.1994). Without Vega–Lara's statements to M.G. inculpating "another person," who was implicitly or explicitly identified as Morales, the primary evidence linking Morales to the crime was his own statement to M.G. about planning the robbery of a house of prostitution. The jury also had before it the implications of Vega–Lara's trial testimony, quoted by the prosecutor in questioning him, that identified Morales as his accomplice. As discussed below, we conclude that questioning, and its resulting implications, also constituted error, and the prejudicial effect of this cumulative error is discussed below. We note that M.G.'s testimony that Morales had briefly discussed planning a robbery with him does not make the error in admitting Vega–Lara's effectively unredacted post-robbery statements detailing Morales's involvement in the crime harmless.

2. Questioning by means of prior trial testimony

■ Morales also argues that the trial court abused its discretion in allowing the prosecutor to call Vega–Lara merely to have him assert his Fifth Amendment privilege and to persist in questioning him, using the transcript of his prior trial testimony to suggest what testimony Vega–Lara would give if he were not asserting the privilege. We agree.

Morales argues that the prosecutor called Vega–Lara in bad faith, merely to have the jury draw an unfavorable inference from his refusal to testify. Vega–Lara legitimately believed he had a Fifth Amendment privilege, given that the use immunity did not cover perjury. The supreme court has indicated that a person has a Fifth Amendment privilege to refuse to answer questions that might subject him to a charge of perjury. *Johnson v. Fabian,* 735 N.W.2d 295, 310–11 (Minn. 2007). Vega–Lara's attorney stated that his client's claim of privilege was based on the risk of a perjury prosecution. The prosecutor herself pointed out that the grant of immunity did not extend to perjury!

Accordingly, Vega–Lara had clearly indicated that he would not testify, and there was no indication to the contrary. The state at trial argued that it could call Vega–Lara to the stand if he had no valid claim of privilege. *See generally State v. Black*, 291 N.W.2d 208, 212 (Minn.1980) (noting that the prosecution called recalcitrant witness who lacked a valid privilege to "determine with certainty" whether she would testify and to lay a foundation for admitting her prior statements and testimony). *Black* appears to allow the prosecutor to call the recalcitrant witness in good faith if she is uncertain whether the witness will claim a privilege and the privilege would not be valid anyway. *Id.* But we need not decide whether the prosecutor was justified in calling Vega–Lara because of the erroneous and prejudicial manner in which that examination proceeded. *See id.* (noting that "the prosecutor's examination was not of a type that prejudiced the defendant to the extent that he was denied a fair trial").

The prosecutor's direct examination of Vega–Lara consisted of nearly 20 transcript pages of questioning, much of it quoting portions of Vega–Lara's testimony implicating Morales. The inference the prosecutor sought to develop from these questions was not merely that Vega–Lara was guilty, or even that he truthfully inculpated Morales in his own trial. Rather, the inference extended to the implication that Morales was guilty of participation in precisely the manner Vega–Lara had described in his own trial.

The prosecutor's questions to Vega–Lara, citing his own trial testimony, covered the following details: (1) Morales had told him he wanted to pull off a robbery in the brothel; (2) he and Morales had gone to the brothel the day before the robbery; (3) when they arrived at the house the day of the robbery, Morales sat on the couch (as described by the eyewitnesses); (4) Morales was carrying a .22 caliber handgun and pulled out his gun in order to rob the victim; (5) Morales struck the victim in the face with the gun; and (6) Vega–Lara shot the victim after he and Morales began struggling over Morales's gun.

For all of these details, except the fact that Morales had planned a robbery in the house and the place where he sat, there was no other evidence properly admitted as proof. (M.G.'s testimony that Vega–Lara had described Morales's role was redacted to refer to "another person," as discussed above).

The United States Supreme Court has noted, without endorsing, lower court holdings that the government may not make a "conscious and flagrant" attempt to build a case out of inferences arising from a witness's assertion of the Fifth Amendment privilege. *Namet v. United States*, 373 U.S. 179, 186–88, 83 S.Ct. 1151, 1154–55, 10 L.Ed.2d 278 (1963). Our supreme court has held that, even when the witness who may assert the privilege is called in good faith, there may be a question whether "in content and extent, the prosecutor's examination is of a type that has prejudiced defendant to the extent that he has been denied a fair trial." *State v. Mitchell*, 268 Minn. 513, 517, 130 N.W.2d 128, 131 (1964); *cf. Black*, 291 N.W.2d at 212 (noting that prosecutor's questions of the witness were brief and the jury was not left to speculate as to what the witness's testimony would have been). The *Namet* Court recognized that the problem of prosecutorial use of a witness's assertion of the Fifth Amendment privilege may be approached under two theories: (1) that such an attempt may constitute "bad faith" prosecutorial misconduct; and (2) that the inferences developed may add "critical weight" to the state's case in a form not subject to cross-examination. *Id.*

We need not discuss the *Namet* Court's "bad faith" theory because the prosecutor's quoting from Vega–Lara's testimony in his own trial plainly added "critical weight" to the state's case, and the defense could not cross-examine Vega–Lara about the inferences created because Vega–Lara refused to answer all but one of defense counsel's questions.

The state cites no authority in Minnesota allowing the prosecutor to ask detailed questions of a witness who persists in a Fifth Amendment privilege claim. The North Dakota Supreme Court has held that a witness must claim the privilege with respect to particular questions. *State v. Zahn,* 562 N.W.2d 737, 740 (N.D.1997). But *Zahn* involved a contempt proceeding, in which the prejudice to the defendant being tried was not a relevant consideration. Here, the prosecutor questioned Vega–Lara, Morales's accomplice, at length, developing much of the state's theory as to Morales's guilt from the accomplice's testimony at his own trial, testimony that the defense was unable to cross-examine.

The trial court gave a cautionary instruction limiting the jury's use of Vega–Lara's prior statements. But this instruction appears to have referred to Vega–Lara's statements to M.G., not to his prior trial testimony as quoted by the prosecutor in questioning him. The trial court instructed the jury that "[t]he attorneys' questions are not evidence." And the prosecutor stated in closing argument that Vega–Lara's prior testimony was not substantive evidence. But there was no need for the prosecutor's detailed recitations of Vega–Lara's prior testimony if the questions bore merely on Vega–Lara's credibility. The questions were deliberately framed to construct a complete narrative of the crime out of Vega–Lara's prior testimony. And none of the witnesses who testified could provide a similar narrative. Thus, neither the court's instructions nor the prosecutor's disavowal could undo the damage.

The detailed recitations of Vega–Lara's prior testimony contained in the prosecutor's questions could not have failed to influence the jury. Those details were much more specific than the vague statements made by Morales to M.G., or even the statements about "another person" Vega–Lara made to M.G. It would have been impossible for a reasonable jury to disregard the substance of Vega–Lara's prior trial testimony.

■■ If the trial court has erred in admitting evidence, this court must determine whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict. *Post,* 512 N.W.2d at 102 n. 2. The inquiry is into what effect the error had on the verdict, and, in particular, on whether the verdict is "surely unattributable" to the error. *State v. King,* 622 N.W.2d 800, 811 (Minn.2001) (quotation omitted). Here, because the admission of part of Vega–Lara's hearsay statement to M.G. without effective redaction was also error, we assess the cumulative effect of both errors. *See generally State v. Mayhorn,* 720 N.W.2d 776, 792 (Minn.2006) (reversing based on cumulative effect of prosecutorial misconduct and evidentiary errors).

As discussed above, there was no physical evidence tying Morales to the murder and there was no identification of him by an eyewitness. M.G.'s testimony that Morales admitted planning, or helping to plan, the robbery was properly admitted. The *Spreigl* evidence of a prior robbery the year before also tended to prove Morales's involvement. These pieces of evidence fall far short of the beyond-a-reasonable-doubt standard. The state's case relied on M.G.'s testimony that Vega–Lara

had pointed to Morales as a participant, as well as the questions to Vega–Lara indicating that Vega–Lara had so testified at his own trial. Thus, the errors committed here involved the central pieces of the state's case. It cannot be said that the verdict was "surely unattributable" to them. Morales is entitled to a new trial.

### 3. *Spreigl* evidence

Morales argues a third evidentiary issue, contending that the trial court abused its discretion in admitting as *Spreigl* evidence Morales's March 2005 juvenile offense, which also involved an aggravated robbery. This court reviews a trial court's ruling admitting *Spreigl* evidence for an abuse of discretion. *State v. Gomez,* 721 N.W.2d 871, 877 (Minn.2006). Although we have concluded that Morales is entitled to a new trial on other grounds, we address this issue for purposes of retrial.

The March 2005 offense, which was two-and-one-half years old by the time of trial, involved the robbery of a pizza delivery man. According to the delinquency petition, which was admitted to prove the *Spreigl* offense, the pizza delivery driver was approached by four men, including Morales, as he returned to his car from attempting a delivery at an apartment where no one answered the door. One man pointed a gun at the man and demanded his cash and the pizza, which the man surrendered, begging for his life. The juvenile court found that Morales committed attempted aggravated robbery.

The admissibility of *Spreigl* evidence is governed by a five-step process: (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant.

*State v. Ness,* 707 N.W.2d 676, 685–86 (Minn.2006). The court in *Ness* explained that

the closer the relationship between the other acts and the charged offense, in terms of time, place, or modus operandi, the greater the relevance and probative value of the other-acts evidence and the lesser the likelihood that the evidence will be used for an improper purpose.

*Id.* at 688. But, in order to be admissible to show a common scheme or plan, the two offenses must be markedly similar. *Id.*

The district court issued a written order finding that the state had given the required *Spreigl* notice, that the offense was shown by clear and convincing evidence, and that the prior offense, although not admissible to prove identity, was admissible to show intent, knowledge and absence of mistake or accident, as well as common scheme or plan.

Morales concedes that the first three *Spreigl* requirements from *Ness* are satisfied here. Morales argues, however, that the district court's finding that the 2005 offense was not relevant to prove identity should have carried over to exclude its admission to prove common scheme or plan. The "common scheme or plan" exception is generally used to prove identity. We conclude that the 2005 offense did have a "marked similarity" with the current offense, as required by *Ness,* so as to support admission to prove common scheme or plan. *Id.* (quotation omitted).

Morales points out that the other participants in the current offense were not involved in the 2005 robbery, that the 2005 offense occurred at a delivery location,

rather than at a business location, as the current offense did, and that the victim was not shot in the 2005 offense. But the 2005 offense and the current offense both involved: (1) planned robberies, (2) committed with a gun; (3) by a number of participants; and (4) directed at a local business operation with informal handling of cash. The fact that the charged offense occurred at a fixed business location and the *Spreigl* offense at a delivery location is not a significant distinguishing characteristic. Neither is the involvement of different participants a significantly distinguishing factor.

The fact that the victim was shot, whereas the *Spreigl* victim was not, is not significant for purposes of a *Spreigl* analysis. C.M. and M.R. testified that they heard sounds of a struggle, and Vega–Lara's statement indicated that it was the victim's struggle over the gun that led to him being shot. Thus, the victim was apparently shot because he resisted, not because that was part of the plan. The fact that the victim apparently resisted the robbery while the pizza deliveryman in March 2005 did not is incidental, and insufficient to overcome the similarities between the crimes.

In *State v. Bartylla*, 755 N.W.2d 8, 21 (Minn.2008), the supreme court affirmed the admission of *Spreigl* evidence of a burglary and assault in the home to prove "identity, absence of mistake, and common scheme or plan" in the trial for a rape and murder that occurred 10 months later. The court rejected the argument that because the *Spreigl* offense did not involve a sexual assault it was too dissimilar to the charged offense to be admitted. *Id.* at 21–22. The court noted a number of similarities, including that both incidents involved the defendant entering a woman's home late at night without consent through an open door, and beating the victim, who was not known to the defendant, about the face. *Id.* at 21. We conclude that, as in *Bartylla*, the similarities in the circumstances of the two offenses are sufficient to overcome the fact that an additional crime (murder) was committed as part of the charged offense.

## DECISION

The trial court abused its discretion in admitting hearsay evidence implicating Morales in the offense when the redaction of his name from the statement was undermined by the timing of the evidence and the argument of the prosecutor.

The court abused its discretion in allowing the prosecutor to question an accomplice who invoked his Fifth Amendment privilege using the accomplice's testimony from his own trial. These errors denied Morales a fair trial.

The admission of the *Spreigl* evidence at this trial was not erroneous. If the state chooses to retry the case, the trial court then will have to assess the admissibility of any proffered *Spreigl* evidence based on the law and the facts developed.

**Reversed and remanded.**